No. 23-1043

# United States Court of Appeals
## for the First Circuit

———————

DHANANJAY PATEL; SAFDAR HUSSAIN; VATSAL CHOKSHI; DHAVAL
PATEL; NIRAL PATEL,
*Plaintiffs-Appellants*,

*v.*

7-ELEVEN, INC.,
*Defendant/Third Party Plaintiff-Appellee*,

MARY CADIGAN, ANDREW BROTHERS,
*Defendants*,

DP MILK STREET INC.; DP JERSEY INC.; DP TREMONT STREET INC.;
DPNEWTO1,
*Third Party Defendants.*

———————

ON APPEAL FROM A FINAL JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

———————

**BRIEF OF THE COMMONWEALTH OF MASSACHUSETTS AS AMICUS
CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

———————

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

Douglas S. Martland, 1st Cir. No. 1137738
Peter N. Downing, BBO No. 675969
Kate Watkins, BBO No. 683276
*Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2062
email: douglas.martland@mass.gov

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF THE AMICUS AND INTRODUCTION ....................................... 1

ARGUMENT ................................................................................. 3

I.     The District Court Misconstrued the Phrase "Performing Any Service" in Section 148B. .................................................. 3

       A.    The Presumption of Employment Status Attaches Under Section 148B(a) If the Worker Does Any Act That Assists or Benefits the Employer. ............................................... 3

       B.    The District Court Mistakenly Reversed the Analysis by Focusing on Whether the Putative Employer, 7-Eleven, Performed Any Service for the Putative Employees, the Franchisee-Plaintiffs. ................................................ 9

       C.    The District Court Also Erred in Concluding that 7-Eleven's Dependence on the Work of Franchisees to Generate Revenue Was Insufficient to Constitute "Services" Under Section 148B. .............................................. 13

II.    The District Court's Construction of "Performing Any Service" Will Undermine the Legislative Purpose of Section 148B and Disrupt the Labor Market in Massachusetts ....................................... 17

       A.    By Converting the Threshold Inquiry into a Balancing Test, the District Court's Approach Will Undermine the Remedial Goals of Section 148B. ........................................... 18

       B.    The Misclassification of Employees as Independent Contractors Undermines Critical Workplace Standards, Fair Competition, and Public Revenue. ................................... 20

             1.    Misclassified Employees Lack Standard Workplace Protections and Earn Lower Wages. ............ 21

2.      By Lowering Their Labor Costs and Associated
        Expenses, Employers Who Misclassify Their
        Employees Gain an Unfair Competitive Advantage
        Over Law-Abiding Firms, Ultimately Driving
        Down Workplace Standards. ..........................................23

CONCLUSION ......................................................................................26

CERTIFICATES OF COMPLIANCE AND SERVICE .........................................27

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Athol Daily News v. Board of Review of the Division of
    Employment and Training*,
    439 Mass. 171, 786 N.E.2d 365 (2003).....................................12

*Awuah v. Coverall N. Am., Inc.*,
    707 F. Supp. 2d 80 (D. Mass. 2010)..........................................8

*Batchelder v. Allied Stores Corp.*,
    393 Mass. 819, 473 N.E.2d 1128 (1985).................................18

*Beck v. Massachusetts Bay Techs., Inc.*,
    No. 16-cv-10759-MBB, 2017 WL 4898322,
    (D. Mass. Sept. 6, 2017) ............................................................8

*Comm'r of Revenue v. AMIWoodbroke, Inc.*,
    418 Mass. 92, 634 N.E.2d 114 (1994)....................................5-6

*Da Costa v. Vanguard Cleaning Systems, Inc.*,
    34 Mass. L. Rptr. 483, 2017 WL 4817349
    (Mass. Super. Ct. Sept. 29, 2017)......................... 7-8, 11-12, 14

*Depianti v. Jan-Pro Franchising Int'l, Inc.*,
    465 Mass. 607, 990 N.E.2d 1054 (2013)................11, 12, 17, 18

*Dep't of Hous. & Urb. Dev. v. Rucker*,
    535 U.S. 125 (2002)....................................................................6

*Drake v. Leicester*,
    484 Mass. 198, 140 N.E.3d 413 (2020)..................................4-5

*Gallagher v. Cerebral Palsy of Mass., Inc.*,
    92 Mass. App. Ct. 207, 86 N.E.3d 496 (2017)....................9, 11

*Jinks v. Credico (USA) LLC*,
    488 Mass. 691, 177 N.E.3d 509 (2021)..........................9, 16, 17

*Hogan v. InStore Grp., LLC*,
    512 F. Supp. 3d 157 (D. Mass. 2021).........................................8

*Monell v. Boston Pads, LLC*,
    471 Mass. 566, 31 N.E.3d 60 (2015).......................................20

*Oliveira v. Advanced Delivery Sys., Inc.*,
    27 Mass. L. Rptr. 402, 2010 WL 4071360,
    (Mass. Super. Ct. July 16, 2010) ..............................................8

*Patel v. 7-Eleven, Inc.*,
    No. 17-cv-11414-NMG, 2022 WL 4540981,
    (D. Mass. Sept. 28, 2022) ...........................4, 10, 12, 13, 14, 17

*Patel v. 7-Eleven, Inc.*,
    489 Mass. 356, 183 N.E.3d 398 (2022)......... 3, 4, 8-9, 10-11, 15

*Ruggiero v. American United Life Insurance Co.*,
    137 F. Supp. 3d 104 (D. Mass. 2015).........................................8

*Sciaba Constr. Corp. v. Frank Bean, Inc.*,
    43 Mass. App. Ct. 66, 681 N.E.2d 288 (1997) ..........................6

*Sebago v. Boston Cab Dispatch, Inc.*,
    471 Mass. 321, 28 N.E.3d 1139 (2015)................7, 9, 11, 13-14

*Somers v. Converged Access, Inc.*,
    471 Mass. 321, 28 N.E.3d 1139 (2015).................11, 12, 18, 20

*Taylor v. E. Connection Operating, Inc.*,
    465 Mass. 191, 988 N.E.2d 408 (2013)...................................18

*Tze-Kit Mui v. Massachusetts Port Auth.*,
    478 Mass. 710, 89 N.E.3d 460 (2018)....................................3-4

*United States v. Gonzales*,
   520 U.S. 1 (1997)...........................................................6

*Weiss v. Loomis, Sayles & Co., Inc.*,
   97 Mass. App. Ct. 1, 141 N.E.3d 122 (2020) ...........................8

## **Statutes**

Mass. Gen. Laws ch. 4, § 6, ¶ 3 ............................................4

Mass. Gen. Laws ch. 63, § 33 ..............................................5

Mass. Gen. Laws ch. 63, § 39A .............................................5

Mass. Gen. Laws ch. 149, § 2 ..............................................1

Mass. Gen. Laws ch. 149, § 5 ..............................................1

Mass. Gen. Laws ch. 149, § 27C ...........................................1

Mass. Gen. Laws ch. 149, §§ 148-150.......................................1

Mass. Gen. Laws ch. 149, § 148 ..........................................23

Mass. Gen. Laws ch. 149, § 148A .........................................21

Mass. Gen. Laws ch. 149, § 148B ....................................*passim*

Mass. Gen. Laws ch. 149, § 148B(a).................................*passim*

Mass. Gen. Laws ch. 149, § 148C .........................................21

Mass. Gen. Laws ch. 151, § 1 ............................................21

Mass. Gen. Laws ch. 151, § 1A ...........................................21

Mass. Gen. Laws ch. 151, § 1B ...........................................21

v

Mass. Gen. Laws ch. 151, § 2 ............................................................21

Mass. Gen. Laws ch. 151, § 2A .........................................................21

Mass. Gen. Laws ch. 151, § 7 ............................................................21

Mass. Gen. Laws ch. 151, § 15 ..........................................................23

Mass. Gen. Laws ch. 151, § 19 ............................................................1

Mass. Gen. Laws ch. 151A, § 2 .........................................................23

## **Rules and Regulations**

Fed. R. App. P. 29(a)(2) ......................................................................2

Mass. S.J.C. Rule 1:03 ........................................................................2

## **Miscellaneous**

The American Heritage Dictionary (2d ed. 1982) ...........................5, 6

Bauer, *The Misclassification of Independent Contractors:*
    *The Fifty-Four Billion Dollar Problem*,
    12 RUTGERS J. L. & POL'Y 138 (2015) .......................................24

Carré & Wilson, The Social and Economic Costs of Employee
    Misclassification in the Construction Industry, Construction
    Policy Research Center, Labor & Worklife Program,
    Harvard Law School & Harvard School of
    Public Health (2004) ............................................................21, 23

Carré, (In)dependent Contractor Misclassification,
    Economic Policy Institute (2015)..................................................24

Council on the Underground Economy,
    More information about the CUE ..................................................24

Crowley, U.S. Dep't of Labor, Worker Misclassification –
    An Update from Constitution Ave. (Oct. 24, 2012)....................22

Elmore & Chishti, Strategic Leverage: Use of State and Local
    Laws to Enforce Labor Standard in Immigrant-Dense
    Occupations, Migration Policy Institute (2018).........................25

Jacobs & Reich, *Massachusetts Uber/Lyft Ballot Proposition
    Would Create Subminimum Wage*, University of
    California Labor Center & Center Wage and Employment
    Dynamics (2021).......................................................................22

Kelsay, Cost Shifting of Unemployment Insurance Premiums
    and Workers' Compensation Premiums, Department
    of Economics, University of Missouri, Kansas City
    (Sept. 12, 2010) .........................................................................25

Leberstein & Ruckelshaus, Independent Contractor vs. Employee:
    *Independent Contractor Why Misclassification Matters
    and What We Can Do To Stop It*,
    National Employment Law Project (May 2016)..................21, 22

Liu, Flaming & Burns, *Sinking Underground; The Growing
    Informal Economy in California Construction*, Econ.
    Roundtable Res. Rep. (2014) ................................................ 21-22

National Employment Law Project, Independent Contractor
    Misclassification Imposes Huge Costs on Workers
    and Federal and State Treasuries (October 2020)...........22, 23, 24

Neuhauser & Donovan, *Fraud in Workers' Compensation
    Payroll Reporting: How Much Employer Fraud Exists?
    How are Honest Employers Affected?*,
    Report to the Fraud Assessment Commission,
    California Department of Insurance (Jan. 2009).........................25

Occupational Health and Safety Administration,
U.S. Department of Labor, Adding
Inequality to Injury: The Costs of Failing
to Protect Workers on the Job (2015) ........................................25

Peter G. Peterson Foundation, Distribution of Federal Funding
from COVID-19 Programs for Massachusetts...................... 23-24

Rebitzer & Weil, Technical Advisory Board Report:
Findings and Implications of the RSI Report to the Joint Task
Force on Employee Misclassification and the Underground
Economy: Contractor Use, Analysis, and Impact Results
(Mar. 31, 2014)..........................................................................21

Treasury Inspector General for Tax Administration,
Additional Actions Are Needed to Make the Worker
Misclassification Initiative With the
Department of Labor a Success (2018)......................................20

Webster's II New Riverside University Dictionary (1984).............. 5, 6

Webster's Third New International Dictionary (1961) ........................5

## INTEREST OF THE AMICUS AND INTRODUCTION

The Commonwealth of Massachusetts has a compelling interest in ensuring the proper interpretation of Massachusetts laws governing wages, hours, and other aspects of the employment relationship. *See*, *e.g.*, Mass. Gen. Laws ch. 149, §§ 2, 5, 27C, and 148-150; Mass. Gen. Laws ch. 151, § 19. The Massachusetts Legislature has granted the Attorney General broad powers to investigate and enforce these laws, including the independent contractor statute, Mass. Gen. Laws ch. 149, § 148B ("Section 148B"), which prohibits the misclassification of employees as independent contractors.

Worker misclassification is a substantial problem across the nation, including in the Commonwealth. It inflicts enormous economic harm on workers, puts law-abiding businesses at a competitive disadvantage, and costs state and federal governments billions of dollars each year in lost revenue. It was against this backdrop that the Massachusetts Legislature enacted Section 148B.

Under Section 148B(a), every person "performing any service … shall be considered to be an employee," unless the putative employer satisfies its burden of proving each prong of the three-part test for independent contractor status set forth in the statute, known as the "ABC test." The Massachusetts Legislature intentionally designed Section 148B(a)'s threshold question to be a simple, unidirectional inquiry—whether the worker performs *any* services for the putative employer. The

decisions of Massachusetts courts interpreting this threshold requirement confirm that a worker who does any act that assists or benefits the putative employer "perform[s]" a "service" under Section 148B(a).

The District Court's novel interpretation of Section 148B(a) represents a significant departure from the statute's plain text and existing precedent. By injecting extraneous considerations into the inquiry—namely, whether the putative *employer* performs services for the *worker*—the District Court's approach would fundamentally transform the threshold requirement, imposing a much more onerous burden for triggering the presumption of employee status under Section 148B(a) than the Legislature intended. The District Court's approach harms workers, complicates the Attorney General's enforcement of Section 148B(a) and the other statutory protections for employees, and is out of step with the statute's broad, remedial purpose.

For these reasons, pursuant to Fed. R. App. P. 29(a)(2), the Commonwealth urges this Court to reverse the District Court's determination that the franchisee-plaintiffs do not perform a service for the putative employer, 7-Eleven, and remand the matter for further proceedings. In the alternative, to the extent this Court harbors any doubt that the District Court misconstrued Section 148B, it should certify the matter to the Supreme Judicial Court pursuant to Mass. S.J.C. Rule 1:03.

## ARGUMENT

### I.    The District Court Misconstrued the Phrase "Performing Any Service" in Section 148B.

To give rise to the presumption that a worker is an employee under Massachusetts law, the Legislature set forth a straightforward test: a worker is presumptively an employee when the worker "perform[s] any service" for the putative employer. Mass. Gen. Laws ch. 149, § 148B(a). Failing to adhere to the plain meaning of that test, the District Court instead considered the inverse question, namely, whether the putative employer performed services for the worker. And further departing from Massachusetts case law, the District Court then concluded that the services performed by 7-Eleven, the putative employer, for the franchisee-plaintiffs outweighed the value to 7-Eleven of the revenue generated by the franchisees. Each of these errors in isolation warrants reversal; taken together, they would transform the low threshold inquiry under Section 148B into a cumbersome balancing test that strays far from the plain text of the statute.

#### A.    The Presumption of Employment Status Attaches Under Section 148B(a) If the Worker Does Any Act That Assists or Benefits the Employer.

Under Massachusetts law, "the plain language of [a] statute" is "'the principal source of insight into legislative intent,'" and where the "statutory language is clear and unambiguous," the statute must be applied as written. *Patel v. 7-Eleven, Inc.*, 489 Mass. 356, 362, 183 N.E.3d 398, 406 (2022) (quoting *Tze-Kit Mui v.*

3

*Massachusetts Port Auth.*, 478 Mass. 710, 712, 89 N.E.3d 460, 462 (2018)). Where the meaning of a statute is not "plain from its language," the statute "must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Patel*, 183 N.E.3d at 406 (internal quotation marks omitted).

The District Court granted judgment in favor of 7-Eleven because it concluded, as a matter of law, that the franchisee-plaintiffs do not "perfor[m] any service" for 7-Eleven, as that phrase is used in Section 148B(a). *Patel v. 7-Eleven, Inc.*, No. 17-cv-11414-NMG, 2022 WL 4540981, at *3-*6 (D. Mass. Sept. 28, 2022). The District Court did not analyze the plain meaning of the phrase "perfor[m] any service," nor did it refer to Massachusetts case law that has examined the plain meaning of that phrase. *See id.* These analytical failings led the District Court to an erroneous result.

When a statutory phrase is not specifically defined by the Legislature, as is the case with "performing any service" in Section 148B, the words must be "construed according to the common and approved usage of the language," Mass. Gen. Laws ch. 4, § 6, ¶ 3, which may be reflected in dictionary definitions. *See Drake*

*v. Leicester*, 484 Mass. 198, 200, 140 N.E.3d 413, 416 (2020). The plain meaning of the word "perform" means "to begin and carry through to completion; do" or "to take action in accordance with the requirements of; fulfill." The American Heritage Dictionary 921 (2d ed. 1982); *accord* Webster's II New Riverside University Dictionary 873 (1984) ("Webster's II"). And although dictionaries define the term "service" to have a number of meanings, the most relevant here are "employment in duties or work for another" or "an act of assistance or benefit to another or others; favor." The American Heritage Dictionary 1121 (2d ed. 1982); *accord* Webster's II, at 1066. The Supreme Judicial Court has likewise construed the statutory term "service" to mean "an act done for the benefit or at the command of another" or "action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something." *Comm'r of Revenue v. AMIWoodbroke, Inc.*, 418 Mass. 92, 95, 634 N.E.2d 114, 115 (1994) (quoting Webster's Third New International Dictionary 2075 (1961) in construing the phrase "services performed" in tax statutes, Mass. Gen. Laws ch. 63, §§ 33 and 39A (1992 ed.)). Thus, a worker who takes action that assists or benefits the putative employer "perform[s]" a "service" under Section 148B(a). *Cf. AMIWoodbroke, Inc.*, 634 N.E.2d at 115-16 (explaining, in concluding that the issuing of interest-free loans from a subsidiary to a parent corporation was a "servic[e] performed," that SJC precedent "support[s] a

broad interpretation of the term 'services'" and that such an interpretation "gives effect to the statute's broad remedial purpose").

Notably, the Legislature deliberately specified that performance of "any" service gives rise to the presumption that the worker is an employee. The original draft of Section 148B(a) did not include the word "any," but that word was inserted before the bill codifying Section 148B was enacted in 1990. *See* Addendum 4 (legislative history of Mass. St. 1990, ch. 464, "An Act Enhancing the Enforcement of Labor Laws"). "Any" means "one or some, regardless of sort, quantity, or number." Webster's II, at 115; *see Dep't of Hous. & Urb. Dev. v. Rucker*, 535 U.S. 125, 131 (2002) ("As we have explained, 'the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997))). The presumption of employment status therefore attaches if the worker performs any service at all for the employer. Should an employer wish to dispute that a worker performs any service, it must show that the worker performs *no* acts that benefit or assist the employer. *Cf. Sciaba Constr. Corp. v. Frank Bean, Inc.*, 43 Mass. App. Ct. 66, 69, 681 N.E.2d 288, 291 (1997) ("We read the phrase 'any Subcontractor' in the indemnity clause to mean precisely that, any subcontractor.").

In accordance with this plain-text reading of Section 148B, courts do not construe the phrase "perfor[m] any service" to impose an onerous burden on

plaintiffs alleging misclassification. Quite the contrary: the cases recognize that the threshold burden is modest, and that the focus of the analysis in most Section 148B cases is the three-pronged ABC test, under which the employer carries the burden. In *Sebago v. Boston Cab Dispatch, Inc.*, for example, the SJC held that taxicab drivers performed a service for the radio association defendants because "[t]he revenue flowing to the radio association" was "directly dependent on the drivers' work of transporting passengers," even though the drivers "were not required to perform services for the radio associations." 471 Mass. 321, 331, 28 N.E.3d 1139, 1149 (2015). And despite an "opaque" factual record, the SJC assumed that the drivers could have provided a service to taxi medallion owner defendants by driving leased taxicabs with advertisements sold by the medallion owners, because such a service would have "increased the value" of the medallions and "facilitated the sale of advertising space." *Sebago*, 28 N.E.3d at 1148-49.

Similarly, in *Da Costa v. Vanguard Cleaning Systems, Inc.*, the Superior Court explained that the franchisee-plaintiffs performed a service for a commercial cleaning company, the top layer of a "three-tier franchise structure," because the company's "revenue … [wa]s directly dependent on commercial cleaning work of the plaintiffs and other unit franchisees" and the company's structure effected an "end run" around Section 148B. 34 Mass. L. Rptr. 483, 2017 WL 4817349, at *5 (Mass. Super. Ct. Sept. 29, 2017). Even though the plaintiffs "were not required to

perform services for" the company, because they could "refuse jobs or not enter into franchise agreements," the reality that "they did in fact do work" for the company was enough to establish that they "perform[ed]" a "service" under Section 148B. *Id.* In *Ruggiero v. American United Life Insurance Co.*, to provide another example, the District Court explained, without lengthy analysis, that an insurance agent performed two "distinct" services for the defendant insurance company—by selling "at least some insurance products on behalf of" the company, and by "recruit[ing], train[ing], and supervis[ing] career agents who also sold insurance products on behalf of" the company—even though the court ultimately concluded, after applying the ABC test, that the insurance agent was an independent contractor. 137 F. Supp. 3d 104, 113, 118 (D. Mass. 2015).[1]

To be sure, Massachusetts courts have recognized some limits on the breadth of the phrase "perfor[m] any service" in Section 148B(a). As the SJC pointed out in this very case, "required compliance with Federal or State regulatory obligations [is

---

[1] Indeed, the threshold burden on plaintiffs alleging misclassification is so minimal that many decisions do not even address whether a worker "perform[s] any service" for the putative employer; instead, the decisions proceed straight to the analysis under the ABC test. *See, e.g.*, *Hogan v. InStore Grp., LLC*, 512 F. Supp. 3d 157, 174-86 (D. Mass. 2021); *Awuah v. Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 82-84 (D. Mass. 2010); *Beck v. Massachusetts Bay Techs., Inc.*, No. 16-cv-10759-MBB, 2017 WL 4898322, at *6-*10 (D. Mass. Sept. 6, 2017); *Weiss v. Loomis, Sayles & Co., Inc.*, 97 Mass. App. Ct. 1, 7-10, 141 N.E.3d 122, 128-30 (2020); *Oliveira v. Advanced Delivery Sys., Inc.*, 27 Mass. L. Rptr. 402, 2010 WL 4071360, at *4-*7 (Mass. Super. Ct. July 16, 2010).

not] enough, *in isolation*, to satisfy th[e] threshold inquiry." *Patel*, 183 N.E.3d at 411 (emphasis added) (citing *Sebago*, 28 N.E.3d at 1148); *accord Gallagher v. Cerebral Palsy of Mass., Inc.*, 92 Mass. App. Ct. 207, 211-14, 86 N.E.3d 496, 499-501 (2017). And the SJC explained in *Jinks v. Credico (USA) LLC* that "the entity for whom the individual directly performs services is ordinarily the individual's employer," whereas a less direct relationship—whereby the putative employer "derived an economic benefit" through an intermediary company as a result of the work of third parties—can, in some circumstances, be too attenuated to meet Section 148B's threshold inquiry. 488 Mass. 691, 696-97, 177 N.E.3d 509, 515-16 (2021). But other than those discrete qualifications, the threshold inquiry under Section 148B is straightforward: a worker who does any act that assists or benefits the putative employer "perform[s]" a "service," thereby triggering the presumption that the worker is an employee, not an independent contractor.

**B.    The District Court Mistakenly Reversed the Analysis by Focusing on Whether the Putative Employer, 7-Eleven, Performed Any Service for the Putative Employees, the Franchisee-Plaintiffs.**

In granting judgment in favor of 7-Eleven, the District Court failed to accord the threshold inquiry of Section 148B its plain meaning. Rather than train its analysis on whether the franchisee-plaintiffs' work assisted or benefited 7-Eleven, as required by the text of Section 148B(a), the District Court flipped the inquiry: it asked, instead, whether *7-Eleven*, the putative employer, performs services for the

9

*franchisees. See Patel*, 2022 WL 4540981, at \*4-\*5 (listing the services that 7-Eleven provides its franchisees). That analysis is the exact opposite of the inquiry prescribed by the statute, and it finds no support in the language of the statute or in any Massachusetts case law construing Section 148B. The District Court should instead have concentrated its analysis solely on whether the franchisee-plaintiffs perform any services for 7-Eleven.

As a textual matter, Section 148B(a) is clear that the threshold inquiry is *only* unidirectional, asking exclusively whether the worker performs any service for the putative employer. Mass. Gen. Laws ch. 149, § 148B(a). The inquiry does not encompass the additional question of whether the putative employer performs any service for the worker. Nor does it contemplate a court resolving the threshold inquiry through a complex assessment of the relative weight of the services exchanged between the parties. But that was the predominant focus of the District Court's inquiry here. *See Patel*, 2022 WL 4540981, at \*4-\*5 (relying on the extensive list of "services" "Defendant renders" to the franchisees and the franchisees' payment of franchisee fees to 7-Eleven to discount the plaintiffs' performance of services under the franchise agreement).

Massachusetts courts routinely describe the threshold inquiry as unidirectional. *See Patel*, 183 N.E.3d at 411 (quoting Mass. Gen. Laws ch. 149, § 148B) (Section 148B(a) analysis "begins with a threshold determination whether

10

the putative employee 'perform[s] any service' for the alleged employer."); *Sebago*, 28 N.E.3d at 1147 ("The threshold question is whether the plaintiffs provided services to the defendants."); *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 621, 990 N.E.2d 1054, 1066-67 (2013) (quoting Mass. Gen. Laws ch. 149, § 148B(a)) ("First, 'an individual performing any service' is presumed to be an employee."); *Somers v. Converged Access, Inc.*, 454 Mass. 582, 589, 911 N.E.2d 739, 747 (2009) (similar); *Gallagher*, 86 N.E.3d at 499 ("We apply § 148B here by asking whether [the worker] provided services to [the putative employer]."). And their actual application of the threshold standard confirms that it is not a balancing test. For example, in *Sebago*, the SJC did not assess whether the radio association or medallion owner defendants performed a service for the taxi drivers; instead, the court examined only whether the drivers performed any service for the radio associations and medallion owners. *See* 28 N.E.3d at 1147-49. Likewise, in *De Costa*, the court considered whether the franchisees performed any service for the cleaning company defendant; it did not also assess whether the cleaning company performed a service for the franchisees, whether through the franchise agreement or

11

otherwise, and then conduct some form of a balancing inquiry. *See* 2017 WL 4817349, at *5.[2]

In application, the District Court's novel construction of Section 148B(a)'s threshold inquiry threatens to upset the well-settled understanding of employment relationships. Take, for instance, some of the examples of services discussed by the SJC in *Athol Daily News v. Board of Review of the Division of Employment and Training*, 439 Mass. 171, 179, 786 N.E.2d 365, 372 (2003). Under the District Court's test, might the art instructor at the art museum no longer be performing services for the museum because the museum advertises the class and gives the instructor a curriculum, art supplies for her students, and a clean classroom? *See Patel*, 2022 WL 4540981 at *4-5 (District Court emphasizing 7-Eleven's "advertising services," purchasing of materials, "clean[ing] and stock[ing] the store," and provision of "Operations Manual" as evidence of the absence of the franchisee-plaintiffs' performance of services). Similarly, would the organist

---

[2] Massachusetts courts have also been loath to read non-textual restrictions into the plain text of Section 148B, such that the statute would provide less protection for workers than intended by the Legislature. *See Depianti*, 990 N.E.2d at 1067 (error to imply limitation—there, requiring an employment contract for Section 148B(a) to apply—where the statutory language does not require it); *Somers*, 911 N.E.2d at 749-50 (rejecting argument that Section 148B(a) analysis must include a de facto assessment of actual damages from misclassification because, "[h]ad the Legislature been concerned with this risk, it would not have written [Section 148B] to impose strict liability on employers").

playing music at the funeral home no longer be performing services for the funeral home if the funeral home pays for tuning the organ and gives the organist the music to play? *See id.* (District Court focusing on 7-Eleven's "maintenance of … equipment and performance of store repairs" and "procure[ment of] the initial inventory"). That there may be an exchange of services—something inherent in most every employment relationship—does not make an employee any less of an employee. Nor does it authorize a court to supplant the Legislature's threshold for determining when a worker's performance of a service triggers the presumption of employment status.

### C.   The District Court Also Erred in Concluding that 7-Eleven's Dependence on the Work of Franchisees to Generate Revenue Was Insufficient to Constitute "Services" Under Section 148B.

Compounding these errors, the District Court also rejected the franchisee-plaintiffs' argument that "because the revenue flowing to 7-Eleven is directly dependent on their stores' revenue, they provide services to 7-Eleven." *Patel*, 2022 WL 4540981, at *5. That conclusion is irreconcilable with the SJC's decision in *Sebago*. In *Sebago*, the SJC deemed the revenue flowing from the worker to the putative employer to be sufficient evidence that the worker performed a "service" under Section 148B. *See* 28 N.E.3d at 1149. As discussed, the SJC held that taxi drivers performed a service for the radio associations within the meaning of Section 148B because "the revenue flowing to the radio association through the voucher

13

program [wa]s directly dependent on the drivers' work of transporting passengers." *Id.*; *see also Da Costa*, 2017 WL 4817349, at *5 (the franchisee-plaintiffs performed a service for the franchisor-defendant where the defendant's structure effected an end run around Section 148B and its "revenue … [wa]s directly dependent on commercial cleaning work of the plaintiffs and other unit franchisees"). The District Court did not mention *Sebago* in rejecting the franchisee-plaintiffs' argument, nor did it recognize the SJC's holding that the flow of revenue from a worker's labor to a putative employer reflects the performance of a service and is ordinarily sufficient to meet the threshold "services" inquiry. *See Sebago*, 28 N.E.3d at 1149.

In concluding that the franchisee-plaintiffs' provision of revenue to 7-Eleven was not sufficient evidence of a "service" under Section 148B, the District Court instead characterized that revenue as a mere "mutual economic interest." *Patel*, 2022 WL 4540981, at *5. And it relied on the SJC's earlier decision in this case, as well as its decision in *Jinks v. Credico (USA) LLC*, for the proposition that because "7-Eleven's mutual economic interests with the plaintiff franchisees in the stores' sales and revenue are inherent in legitimate franchise relationships," that revenue cannot, as a matter of law, constitute a service performed for 7-Eleven under Section 148B. *Id.*; *but see Da Costa*, 2017 WL 4817349, at *5 (holding the opposite with respect to the franchisor-franchisee relationship in that case).

The District Court misconstrued *Patel* and *Jinks* by concluding that 7-Eleven's reliance on its franchisees' revenue cannot be evidence of an individual "performing any services" under Section 148B. Neither of the decisions rejected the argument that the flow of revenue from the worker's labor to the putative employer is evidence of the performance of services. Rather, both *Patel* and *Jinks* rejected a different argument: that the ABC test in Section 148B should be extended to any alleged employment relationship where the parties share any "mutual economic interest[]," no matter how attenuated. *See Patel*, 183 N.E.3d at 411.

In *Patel*, the SJC emphasized that the threshold test in Section 148B remains focused on whether an individual performs any service for the putative employer. 183 N.E.3d at 404, 411-12. Citing *Jinks*, the SJC noted that a relationship based on "mutual economic interests" does not necessarily answer whether an "individual perform[s] any service" for the alleged employer. *Id.* at 411. As part of its additional guidance on Section 148B, the SJC instructed that a court must distinguish between "legitimate arrangements and misclassification" by examining the facts of each case, starting with the threshold question of whether the individual "perform[s] any service" for the alleged employer. *Id.* Here, however, the District Court conflated the guidance in *Patel* by holding that the flow of substantial revenue from the franchisees-plaintiffs' labor to 7-Eleven was nothing more than "mutual economic

15

interests," rather than a relevant fact indicative of the services performed by the franchisees for 7-Eleven.

The District Court similarly misconstrued *Jinks* in rejecting the Plaintiff's revenue argument. *Patel*, 2022 WL 4540981, at \*5. *Jinks* did not narrow or alter the services threshold for Section 148B. *See Jinks*, 177 N.E.3d at 513, 515-19. Rather, *Jinks* concerned the general rule that, under Section 148B, "one entity is not the employer of a different entity's employees." *Id.* at 517. Put otherwise, *Jinks* explained that, subject to exceptions outlined in the decision, "the entity for whom the individual directly performs services is ordinarily the individual's employer responsible for compliance with the wage laws." *Id.* at 516.

The concept of "economic benefit" arose in *Jinks* because the plaintiff argued that, even without a direct relationship between a worker and an alleged employer, the court should find an employment relationship in a multi-tiered franchise arrangement so long as that alleged employer indirectly "derives an economic benefit" from the worker's service. *Id*. at 515. The SJC rejected such an indirect application of the statute because, subject to the exceptions discussed in the decision, it failed to adhere to the basic threshold test for performing services in Section 148B. *Id*. at 515-16. But *Jinks* did not hold that the flow of revenue directly from the worker's labor to the putative employer is insufficient evidence of services. To the contrary, when the relationship is one directly between the worker and the company,

16

ordinarily the company that "enters into arrangements with [workers]" to perform the work "'would be the agent of any misclassification' as the [workers'] direct employer." *Id.* (quoting *Depianti*, 990 N.E.2d at 1068 n.17).

Here, however, the District Court's decision characterized the relationship between franchisee-plaintiffs and 7-Eleven as merely a shared "economic interest," even though it found precisely the kind of direct relationship contemplated in *Jinks. See Patel*, 2022 WL 4540981, at *5.[3] This approach conflicts with the instruction from *Jinks* that it is ordinarily clear that the entity that "enters into arrangements with" workers to perform the work "'would be the agent of any misclassification.'" *Jinks*, 177 N.E.3d at 516 (quoting *Depianti*, 990 N.E.2d at 1068 n.17). Accordingly, it was error for the District Court to read *Jinks* as precluding a finding of services based on the flow of revenue from the franchisee-plaintiffs to 7-Eleven.

## II. The District Court's Construction of "Performing Any Service" Will Undermine the Legislative Purpose of Section 148B and Disrupt the Labor Market in Massachusetts.

Not only did the District Court's analysis depart from Section 148B's plain text and the Massachusetts case law interpreting that text, it also failed to honor the Legislature's intent in enacting the statute. As a remedial statute, Section 148B aims

---

[3] The District Court specifically noted the existence of contractual arrangement between franchisees and 7-Eleven. *See Patel*, 2022 WL 4540981, at *1 ("[t]wo of the named plaintiffs … entered into franchise agreements directly with 7-Eleven").

to help workers by ensuring that employees are not misclassified as independent contractors. The decision below undermines that salutary aim. In so doing, it threatens to weaken hard-won workplace protections, put law-abiding employers at a competitive disadvantage, and deprive Massachusetts and the federal government of revenue derived from proper employment classifications.

### A.   By Converting the Threshold Inquiry into a Balancing Test, the District Court's Approach Will Undermine the Remedial Goals of Section 148B.

The purpose of Section 148B is "'to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees.'" *Depianti*, 990 N.E.2d at 1066 (quoting *Taylor v. E. Connection Operating, Inc.*, 465 Mass. 191, 198, 988 N.E.2d 408, 413 (2013)). As an employment and a remedial statute, Section 148B(a) is "'entitled to liberal construction,'" so that the Legislature's aim to ensure that all employees in Massachusetts receive the benefits of the Commonwealth's Wage and Hour Laws may be effectuated. *Id.* (quoting *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822, 473 N.E.2d 1128, 1130 (1985)); *see also Somers*, 911 N.E.2d at 749 ("A legislative purpose behind the independent contractor statute is to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors.").

18

The District Court's misconstruction of Section 148B(a)'s threshold requirement defeats that purpose in two main ways. First, it transforms the threshold question from a simple and straightforward inquiry—whether the worker performs *any* services for the putative employer—into a complex factual dispute about nearly all aspects of the relationship between the worker and putative employer. Second, it substantially increases the low burden necessary to trigger the presumption of employee status by requiring workers not only to establish that they perform any service, but also to prove that their service outweighs any services performed by the employer. Under the District Court's approach, putative employers will have every incentive to cloud the evidentiary record with irrelevant facts about the services they provide their workers, then move for summary judgment on the ground that the worker cannot satisfy their now-heavy burden of proof. Indeed, that is exactly what happened here. And in such cases, the putative employer would never be put to its burden of proving all three elements of ABC test for independent contractor status. Consequently, the District Court's construction of Section 148B could, if upheld, deter meritorious misclassification lawsuits and lead to more, rather than less, misclassification of employees across Massachusetts.

There is no indication that the Legislature intended the statute's threshold inquiry to pose such an obstacle before even applying the ABC test established by the statute to protect against misclassification. *See supra*, at 3-12. Time and again,

Massachusetts courts have confirmed that as a "remedial statute," Section 148B "should be given a construction that furthers, not defeats, its purpose." *Monell v. Boston Pads, LLC*, 471 Mass. 566, 575, 31 N.E.3d 60, 67 (2015). The District Court's injection of a new, non-textual balancing test into Section 148B's threshold inquiry, together with its conclusion that the flow of revenue from a franchisee to a franchisor cannot, as a matter of law, constitute evidence of performance of a "service," severely undermines the legislative purpose of Section 148B.

### B.    The Misclassification of Employees as Independent Contractors Undermines Critical Workplace Standards, Fair Competition, and Public Revenue.

If affirmed, the District Court's reasoning risks imposing a chilling effect on misclassification cases across the labor market in Massachusetts. Misclassification inflicts enormous economic harm on workers by denying them access to myriad employment protections; undermines law-abiding businesses; and costs state and federal governments billions of dollars each year in lost revenue. *See Somers*, 911 N.E.2d at 749-50 (acknowledging the harms that Section 148B seeks to deter).[4]

---

[4] Misclassification costs governments billions of dollars annually in revenue and deprives Social Security, Medicare, unemployment insurance, and workers' compensation funds of money that supports vital public benefits. *See* Treasury Inspector General for Tax Administration, Additional Actions Are Needed to Make the Worker Misclassification Initiative With the Department of Labor a Success, at 2 (2018), tinyurl.com/mueh983f. Studies have estimated that Massachusetts loses millions of dollars in revenue to misclassification annually, including millions in
(footnote continued)

Where the Legislature deliberately sought to prevent these harms, Section 148B should not be construed in manner that defeats that intent.

### 1.     Misclassified Employees Lack Standard Workplace Protections and Earn Lower Wages.

A host of state and federal laws entitle employees to minimum rates of compensation and enhance recourse available to them to vindicate their rights against a putative employer. Under Massachusetts law, employees are entitled to, for example, a minimum wage, *see* Mass. Gen. Laws ch. 151, §§ 1, 2, 2A, and 7; overtime pay, *see id.* §§ 1A and 1B; earned sick leave, *see* Mass. Gen. Laws ch. 149, § 148C; and protection against retaliation by employers, *see id.* § 148A.

Unsurprisingly, the subversion of these employment protections through misclassification is associated with lower earnings for workers.[5] And this reduction

---

unpaid unemployment insurance taxes. *See* Rebitzer & Weil, Technical Advisory Board Report: Findings and Implications of the RSI Report to the Joint Task Force on Employee Misclassification and the Underground Economy: Contractor Use, Analysis, and Impact Results, at 17-19 (Mar. 31, 2014), https://www.mass.gov/files/ 2017-07/technical-advisory-board-report_0.pdf; Carré & Wilson, *The Social and Economic Costs of Employee Misclassification in Construction [Massachusetts Report]*, Construction Policy Research Center, Labor & Worklife Program, Harvard Law School & Harvard School of Public Health, at 1-2 (2004), https://scholarworks. umb.edu/cgi/viewcontent.cgi?article=1042&context=csp_pubs.

[5] Leberstein & Ruckelshaus, *Independent Contractor vs. Employee: Why Independent Contractor Misclassification Matters and What We Can Do To Stop It*, National Employment Law Project, at 3 (May 2016), https://s27147.pcdn.co/wp-content/uploads/Policy-Brief-Independent-Contractor-vs-Employee.pdf (attributing lower earnings in part to wage violations). *See also* Liu, Flaming & Burns, *Sinking*
(footnote continued)

in gross earnings is compounded by worker liability for business costs, such as mileage, necessary equipment and supplies, and the employer's share of payroll taxes, or even fees charged by the employer.[6]

These factors often result in net earnings for workers that are not just lower than they would be absent misclassification, but also unlawful. One study posits that app-based drivers may earn as little as $4.82 per hour after accounting for the hidden costs of unpaid waiting time, payroll taxes, lost benefits, and expenses.[7] In the last three fiscal years, the Massachusetts Attorney General's Office has identified thousands of workers impacted by misclassification.[8] Research tells us that this is

---

*Underground: The Growing Informal Economy in California Construction*, Econ. Roundtable Res. Rep. at 2, 12 (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2772783 (finding that construction workers misclassified as independent contractors made as little as 64 cents for every dollar earned by counterparts who were properly classified as independent contractors).

[6] Leberstein & Ruckelshaus, *supra* note 5, at 3 (surveying case studies); National Employment Law Project, Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries, at 5 & n. 23 (Oct. 2020), tinyurl.com/mr23u889, *citing* Crowley, U.S. Dep't of Labor, Worker Misclassification – An Update from Constitution Ave. (Oct. 24, 2012) (providing example showing misclassification of construction worker reducing after-tax earnings by half).

[7] Jacobs & Reich, Massachusetts Uber/Lyft Ballot Proposition Would Create Subminimum Wage, University of California Labor Center & Center Wage and Employment Dynamics (2021), https://laborcenter.berkeley.edu/mass-uber-lyft-ballot-proposition-would-create-subminimum-wage/.

[8] *See* data collected at https://www.mass.gov/doc/ags-fair-labor-division-enforcement.

the tip of the iceberg.[9] Nationwide, several million employees are likely misclassified.[10] Upholding the District Court's unwarranted alteration of the threshold requirement for triggering Section 148B(a)'s presumption of employee status would further exacerbate the exploitation of vulnerable workers by unscrupulous employers.

    **2.**　　**By Lowering Their Labor Costs and Associated Expenses, Employers Who Misclassify Their Employees Gain an Unfair Competitive Advantage Over Law-Abiding Firms, Ultimately Driving Down Workplace Standards.**

In addition to the costs shifted onto misclassified employees, businesses that misclassify employees under Section 148B avoid other expenses that their law-abiding competitors absorb. These include the costs of tracking working time and wages (Mass. Gen. Laws ch. 151, § 15), making timely payment of wages and issuing paystubs (Mass. Gen. Laws ch. 149, § 148), and paying for important safety-net benefits such as workers' compensation and unemployment insurance.[11]

---

[9] Even in the early 2000s, researchers estimated that nearly 250,000 Massachusetts workers may have been misclassified. *See* Carré & Wilson, *supra* note 4, at 11.

[10] National Employment Law Project, *supra* note 6, at 2.

[11] The substantially similar ABC test set forth in Mass. Gen. Laws ch. 151A, § 2, establishes employees' right to unemployment benefits. During the COVID-19 pandemic, Congress granted nearly $6 billion in funding to Massachusetts for Pandemic Unemployment Assistance, which provided unemployment benefits to individuals who would not ordinarily qualify for unemployment benefits, including those who were classified as independent contractors. Peter G. Peterson Foundation,
(footnote continued)

As a number of studies have concluded, and as our enforcement experience has demonstrated, misclassification is rarely accidental.[12] Instead, in most cases, it is "done on purpose in order to gain a competitive advantage over employers that obey the law."[13] An employer that misclassifies its employees under Section 148B for purposes of avoiding wage and hour obligations therefore is also likely to misclassify its employees for purposes of avoiding unemployment contributions, workers' compensation insurance premiums, and payroll taxes.[14] This incentive is especially powerful in industries with higher labor costs, like construction, where studies estimate that employers may lower their overall labor costs by as much as 30% through misclassification.[15]

---

Distribution of Federal Funding from COVID-19 Programs for Massachusetts, www.pgpf.org/understanding-the-coronavirus-crisis/coronavirus-funding-state-by-state.

[12] *See* Carré, (In)dependent Contractor Misclassification, Economic Policy Institute, at 9 (2015), https://files.epi.org/pdf/87595.pdf (employers who violated Section 148B misclassified 25% to 39% of their workforce).

[13] Bauer, *The Misclassification of Independent Contractors: The Fifty-Four Billion Dollar Problem*, 12 RUTGERS J. L. & POL'Y 138, 141 (2015).

[14] For this reason, the Attorney General refers information about employers who misclassify employees under Section 148B to relevant state and federal agencies through the Council on the Underground Economy (CUE). *See* Council on the Underground Economy, More information about the CUE, https://www.mass.gov/service-details/more-information-about-the-cue.

[15] National Employment Law Project, *supra* note 6, at 1.

24

These employers not only drive down their own expenses but also increase compliant employers' costs. Economist Michael P. Kelsay found that $831.4 million in unemployment taxes and $2.54 billion in workers' compensation premium losses are shifted annually to responsible employers because their competitors use misclassification to avoid paying those costs.[16] Employers who misclassify their employees thus unfairly achieve a superior competitive position, forcing compliant peers to leave the market or conform to a developing norm of non-compliance, in either case worsening working conditions for workers throughout the sector.[17]

All told, the District Court's novel interpretation of Section 148B not only strays from the plain text and legislative purpose animating the statute, but also

---

[16] Kelsay, Cost Shifting of Unemployment Insurance Premiums and Workers' Compensation Premiums, Department of Economics, University of Missouri, Kansas City, at 5-6 (Sept. 12, 2010). For further discussion of cost shifting, *see* Neuhauser & Donovan, *Fraud in Workers' Compensation Payroll Reporting: How Much Employer Fraud Exists? How are Honest Employers Affected?*, Report to the Fraud Assessment Commission, California Department of Insurance (Jan. 2009), https://www.dir.ca.gov/chswc/Reports/2011/Final_Report_FAC_Premium_Avoidance.pdf; Occupational Health and Safety Administration, U.S. Department of Labor, Adding Inequality to Injury: The Costs of Failing to Protect Workers on the Job, at 8, 15 n.23 (2015), https://www.osha.gov/sites/default/files/inequality_michaels_june2015.pdf.

[17] Elmore & Chishti, Strategic Leverage: Use of State and Local Laws to Enforce Labor Standard in Immigrant-Dense Occupations, Migration Policy Institute, at 9, 11-12 (2018), https://www.migrationpolicy.org/research/strategic-leverage-use-state-and-local-laws-enforce-labor-standards-immigrant.

threatens to weaken vital protections for employees and disadvantage law-abiding businesses.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the judgment of the District Court and remand for further proceedings or, in the alternative, certify to the Supreme Judicial Court the question whether the District Court properly construed the phrase "performing any service" in Section 148B.

Respectfully submitted,

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
Douglas S. Martland, 1st Cir. No. 1137738
Peter N. Downing, BBO No. 675969
Kate Watkins, BBO No. 683276
*Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2062
douglas.martland@mass.gov

Date: March 28, 2023

26

## CERTIFICATES OF COMPLIANCE AND SERVICE

### Certificate of Compliance with Rule 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6,009 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ Douglas S. Martland

### Certificate of Service

I hereby certify that on March 28, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel of record for all parties are registered as ECF Filers and will therefore be served by the CM/ECF system.

/s/ Douglas S. Martland

# <u>ADDENDUM</u>

Legislative History, Mass. St. 1990, ch. 464
    *An Act Enhancing the Enforcement*
    *of Labor Laws* (Dec. 29, 1990).............................................................. 1

# HOUSE . . . . . . . No.  175

Accompanying the eighth recommendation of the Department of Labor and Industries (House, No. 167). Commerce and Labor.

### The Commonwealth of Massachusetts

In the Year One Thousand Nine Hundred and Ninety.

An Act to enhance the enforcement of labor laws.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

1  Chapter 149 of the General Laws appearing in the 1988 Official
2  Edition of the Massachusetts General Laws is hereby amended
3  by adding a new section: —
4  Section 148B. No person, corporation or other business
5  arrangement or organization shall, for the purpose of evading this
6  chapter, establish any arrangement or organization in his or her
7  business, by contract, lease or agreement, whether written or oral,
8  whereby a person who would otherwise be his or her employee
9  does not have the status of such employee. The president and
10  treasurer of a corporation and any officers or agents having the
11  management of such corporation shall be deemed to be the
12  employers within the meaning of this section. For the purpose of
13  this section, service performed by an individual, except in such
14  cases as the context of this chapter otherwise requires, shall be
15  deemed to be employment subject to this section irrespective of
16  whether the common-law relationship of master and servant
17  exists, unless and until it is shown that: (a) such individual has
18  been and will continue to be free from control and direction in
19  connection with the performance of such services, both under his
20  contract for the performance of service and in fact; and (b) such
21  service is performed either outside the usual course of the business
22  for which the service is performed or is performed outside of all
23  the places of business of the enterprise for which the service is
24  performed, and (c) such individual is customarily engaged in an

2                              **HOUSE — No. 175**          **[January 1990]**

25 independently established occupation, profession or business of
26 the same nature as that involved in the service performed.
27    Whoever violates this section shall be punished by a fine of not
28 less than one hundred dollars, nor more than one thousand
29 dollars, or by imprisonment for not more than two months in the
30 house of correction, or both such fine and imprisonment.

This Document Has Been Printed On 100% Recycled Paper.

H 175, changed

*AN ACT* ENHANCING THE ENFORCEMENT OF LABOR LAWS.

House of Representatives, December 18, 1990.

Rightly and Truly Prepared for Final Passage.

_____ , House Clerk.

In Senate, December 18, 1990.

Rightly and Truly Prepared for Final Passage.

_____ , Senate Clerk.

This Act originated in the *House* _____ , Clerk.

H.R., December 18, 1990.
   Enacted. Motion (Bump of Braintree) to reconsider negatived. Sent to the Senate.

_____ , Clerk.

(House, No. **167**).

Accompanying the eighth recommendation of the Department of Labor and Industries
(House, No. 167). Commerce and Labor.



# The Commonwealth of Massachusetts

---

### IN THE YEAR ONE THOUSAND NINE HUNDRED AND NINETY

## AN ACT

*Enhancing*

~~TO ENHANCE~~ THE ENFORCEMENT OF LABOR LAWS.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:*

~~SECTION 1.~~ *Chapter* C. 149 of the General Laws, as appearing in the 1988 official edition of the ~~Massachusetts General Laws~~ is hereby amended by adding ~~a new section:~~ *the following*

Section 148B.

~~No person, corporation or other business arrangement or organization shall, for the purpose of evading this chapter, establish any arrangement or organization in his or her business, by contract, lease or agreement, whether written or oral, whereby a person who would otherwise be his or her employee does not have the status of such employee.~~ The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed ~~to be~~ the employers within the meaning of this section. For the purpose of this section, ~~service performed by an individual,~~ *Individuals performing any service*

*services* *(authorized under)*

except ~~in such cases~~ as the context of this chapter ~~otherwise~~
~~requires~~, shall be deemed to be employment subject *ees under* to this section
~~irrespective of whether the common-law relationship of master and~~
~~servant exists,~~ unless and until it is shown that: ~~(a)~~ such
individual has been and will continue to be free from control and
direction in connection with the performance of such services ~~both~~
under his contract ~~for the performance of service and in fact~~; and
~~(b)~~ such service is performed either outside the usual course of the
business for which the service is performed or is performed outside
of all ~~the~~ places of business of the enterprise ~~for which the service~~
~~is performed~~; and, ~~(c)~~ such individual is customarily engaged in an
independently established occupation, profession or business of the
same nature as that involved in the service performed.

Whoever violates this section shall be punished by a fine of not less
than one hundred dollars, nor more than one thousand dollars, or by
imprisonment for not more than two months in the house of correction,
or both such fine and imprisonment.

The failure to withhold federal or state income
taxes, unemployment compensation and/or workers
compensation from an employee's wages shall not
be used for the purposes of making a determination
under this section.

## HOUSE OF REPRESENTATIVES

JUL 1 7 1990

*Passed to be engrossed,*
*Sent to the Senate.*
                *, Clerk*

*Robert E. MacQueen*

# SENATE

NOV 2 8 1990

Passed to be engrossed in concurrence

*Edward B. O'Neill*

# House, No. 175 .........CHANGE)

**BILL** to enhance the enforcement of labor laws.

So much of the recommendations of the Department of Labor and Industries (House, No. 167) as relates to enhancing the enforcement of labor laws.

=============================

H.R., Jan. 3, 1990.
Referred to the committee on COMMERCE AND LABOR.
Sent to the Senate for concurrence.

=============================

*Edward B. O'Neill*, Clerk.

Senate, Jan. 3, 1990.
The Senate concurs.

=============================

*Edward B. O'Neill*, Clerk.

H. R. May 7, 1990.
Read; and O. D. for a 2nd. rdg.

=============================

**MAY 8 1990** — Read 2nd & ord. 3rd
Read; and O. D. for a 2nd. rdg.

=============================

July 17, — Read 3rd., B. T. R. discharged; and engrossed.

---

Senate Committee on BTR
"correctly drawn"

*Thomas E. Morse*
For the Committee

NOV 27 1990 — ODZd

NOV 28 1990

— Read 2nd & ord. 3rd.
Rules suspended, read 3rd & engrossed.

NOV 29 1990 — Postponed (Rauschenbach) to Monday, December 3rd
(Ques. on reconsideration of Engrossment)

Subsequently, motion (Rauschenbach) to reconsider 2nd in ODNS.

---

5124

NOV -1 1989

DEC 10 1990 — PPNS (Lees).
L.O.T. ODNS.

Motion (Rauschenbach) to L.O.T. ODNS.

(Ques. on reconsideration of eng., with L.O.T. & PPNS pending).

December 17, 1990-Postponed to the next session (Rauschenbach).

(Ques. on reconsideration of eng. with L.O.T. & PPNS pending).

DEC 18 1990 — L.O.T. negatived.
PPNS negatived.
Reconsideration negatived.

DEC 18 1990 — L.O.T. negatived.
PPNS negatived.
Reconsideration negatived.