# UNITED STATES COURT OF APPEALS
## For the First Circuit

---

No. 23-1043

DHANANJAY PATEL; SAFDAR HUSSAIN; VATSAL CHOKSHI;
DHAVAL PATEL; NIRAL PATEL

Plaintiffs - Appellants,

v.

7-ELEVEN, INC.,

Defendant/Third-Party Plaintiff-Appellee,

MARY CARRIGAN; ANDREW BROTHERS

Defendants,

DP MILK STREET INC.; DP JERSEY INC.; DP TREMONT STREET
INC.; DPNEWT01

Third-Party Defendants.

## **OPPOSITION BRIEF OF 7-ELEVEN, INC.**

---

Norman M. Leon, Esq.
Patricia C. Zapata, Esq.
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-4000
*norman.leon@dlapiper.com*
*patricia.zapata@dlapiper.com*

Matthew J. Iverson, Esq.
NELSON MULLINS RILEY &
SCARBOROUGH LLP
One Financial Center, Suite 3500
Boston, MA 02111
(617) 217-4700
*matthew.iverson@nelsonmullins.com*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... 1

REASONS WHY ORAL ARGUMENT SHOULD BE PERMITTED ....... 2

STATEMENT OF THE ISSUES ................................................... 2

STATEMENT OF THE CASE ..................................................... 3

STATEMENT OF THE FACTS ..................................................... 6

I.     Plaintiffs And Their Businesses. ...................................... 6

II.    How Franchising Works ................................................ 11

III.   7-Eleven ............................................................... 13

SUMMARY OF THE ARGUMENT ................................................. 16

ARGUMENT ..................................................................... 19

I.     Plaintiffs' Technical Arguments Are Meritless. ........................ 19

       A.    Patel Did Not Hold That The District Court Must
             Apply The ABC Test In This Case. .............................. 19

       B.    Massachusetts Courts Have Not "Uniformly
             Recognized" That Franchisees Provide Services To
             Franchisors .................................................... 21

       C.    7-Eleven Did Not Concede The Threshold Inquiry. ............. 23

II.    The Decision Tracks Existing Authority Interpreting The
       Threshold Inquiry. ..................................................... 23

       A.    Sebago .......................................................... 25

             1.    The Sebago Defendants And How The SJC
                   Applied The Threshold Inquiry To Each Of Them ...... 26

i

      2.     7-Eleven Is Like The Medallion Owners in Sebago, Not The Radio Associations ............................ 28

      3.     Plaintiffs Cannot Contest The 2020 Decision's Finding That 7-Eleven Does Not Pay Plaintiffs .......... 33

   B.     Jinks ................................................................... 35

   C.     Ruggiero .............................................................. 38

   D.     Da Costa ............................................................. 39

   E.     The Commonwealth Misreads The Decision. ....................... 40

III.  Plaintiffs Waived The Commonwealth's Textual Argument And, In Any Case, The Decision Accords With One Of The Commonwealth's Definitions. ........................................ 43

   A.     The Commonwealth's First Definition Aligns With The District Court's Interpretation Of The ICL. ....................... 44

   B.     The Commonwealth's Second Definition Criminalizes Favors. ................................................................. 46

   C.     AMIWoodbroke Does Not Support The Commonwealth's Interpretation ........................................ 49

   D.     The Term "Any" In The ICL Does Not Change The Analysis. ............................................................... 50

IV.  The Sky Is Not Falling – The District Court's Decision Accords With The ICL's Purpose. ................................... 51

V.   There Is No Need To Involve The SJC A Second Time. ............... 55

CONCLUSION ............................................................. 55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>7-Eleven, Inc. v. Sodhi</u>,
    Civ. Action No. 13-3715 (MAS) (JS), 2016 WL 3085897
    (D.N.J. May 31, 2016), <u>aff'd</u>, 706 F. App'x 777 (3d Cir.
    2017) ............................................................................................. 14

<u>Attorney General v. School Committee of Essex</u>,
    387 Mass. 326, 439 N.E.2d 770 (1982) ............................................... 49

<u>Awuah v. Coverall North America, Inc.</u>,
    707 F. Supp. 2d 80 (D. Mass. 2010) .............................................. 21, 22

<u>Comm'r of Revenue v. AMIWoodbroke, Inc.</u>,
    418 Mass. 92, 634 N.E.2d 114 (1994) .......................................... 49, 50

<u>Commonwealth v. Cooper</u>,
    91 Mass. App. Ct. 595, 77 N.E.3d 324 (2017).................................... 45

<u>Coverall North America, Inc. v. Com'r of Div. of</u>
    <u>Unemployment Assistance</u>,
    447 Mass. 852, 857 N.E.2d 1083 (2006) ...................................... 21, 22

<u>Da Costa v. Vanguard Cleaning Sys., Inc.</u>,
    2017 WL 4817349 (Mass. Super. Sept. 29, 2017)...................... *passim*

<u>Dalombo Fontes v. Gonzales</u>,
    498 F.3d 1 (1st Cir. 2007) .................................................................. 44

<u>DeGiovanni v. Jani-King Int'l</u>,
    No. 1:07-cv-10066 (Dkt. 208) (D. Mass. June 8, 2012)................. 21, 22

<u>Haitayan v. 7-Eleven, Inc.</u>,
    No. 21-56144, 2022 WL 17547805 (9th Cir. Dec. 9, 2022) ........... 14, 23

<u>Haitayan v. 7-Eleven, Inc.</u>,
    No. CV 17-7454 DSF (ASX), 2021 WL 4078727 (C.D. Cal.
    Sept. 8, 2021) ..................................................................................... 22

iii

Jinks v. Credico (USA) LLC,
    488 Mass. 691, 177 N.E.3d 509 (2021) ...................................... *passim*

Kelly v. Riverside Partners, LLC,
    964 F.3d 107 (1st Cir. 2020) ............................................................. 21

Labor Relations Div. v. Teamsters Local 379,
    156 F.3d 13 (1st Cir. 1998) ................................................................ 34

Monell v. Boston Pads, LLC,
    471 Mass. 566, 31 N.E.3d 60 (2015) ................................................. 47

Patel v. 7-Eleven, Inc.,
    485 F. Supp. 3d 299 (D. Mass. 2020) ....................................... *passim*

Patel v. 7-Eleven, Inc.,
    489 Mass. 356, 183 N.E.3d 398 (2022) ...................................... *passim*

Patel v. 7-Eleven, Inc.,
    8 F.4th 26 (1st Cir. 2021).................................................................... 4

Patel v. 7-Eleven, Inc.,
    No. 18 C 07010, 2019 WL 3554438 (N.D. Ill. Aug. 5, 2019)............. 34

Patel v. 7-Eleven, Inc.,
    No. 20-1999, 2022 WL 4545497 (1st Cir. Apr. 25, 2022) .................... 5

Patterson v. Domino's Pizza, LLC,
    60 Cal. 4th 474, 333 P.3d 723 (2014)................................................ 12

Ruggiero v. American United Life Insurance Co.,
    137 F. Supp. 3d 104 (D. Mass. 2015)................................ 23, 24, 38, 40

Sebago v. Boston Cab Dispatch, Inc.,
    471 Mass. 321, 28 N.E.3d 1139 (2015) ..................................... *passim*

Singh v. 7-Eleven, Inc.,
    No. C-05-04534 RMW, 2007 WL 715488 (N.D. Cal. Mar. 8,
    2007).................................................................................................. 14

Timberland Design, Inc. v. First Service Bank for Savings,
    932 F.2d 46 (1st Cir. 1991) ............................................................... 43

<u>U.S. Steel v. M. DeMatteo Const. Co.</u>,
  315 F.3d 43 (1st Cir. 2002) ................................................................. 55

<u>Wickham v. Southland Corporation</u>,
  168 Cal. App. 3d 49 (Cal. App. Ct. 1985) ........................................... 14

**Statutes**

G.L. c. 63, § 33 (1992 ed.) ........................................................................ 49

G.L. c. 63, § 39A (1992 ed.) ...................................................................... 49

G.L. c. 64H § 1 ........................................................................................ 45

G.L. c. 149 § 148B ........................................................................... *passim*

**Other Authorities**

16 C.F.R. § 436.1 ............................................................................. *passim*

American Heritage Dictionary 1121 (2d ed. 1982) .......................... 46, 47

American Heritage Dictionary of the English Language,
  https://www.ahdictionary.com/word/search.html?q=emplo
  y (last visited May 23, 2023) ............................................................... 44

Supreme Judicial Court Rule 1:03(1) ..................................................... 55

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee 7-Eleven, Inc., a Texas corporation, is wholly-owned by SEJ Asset Management & Investment Company, Inc. ("SAM"), a Delaware corporation.  SAM is owned in part by Seven-Eleven Japan Co., Ltd. ("SEJ"), a Japanese corporation.  SEJ is wholly-owned by Seven & i Holdings, Co., Ltd., a Japanese corporation, whose stock is publicly traded on the Tokyo Stock Exchange.  SAM is also owned in part by Seven & i Holdings, Co., Ltd.

## REASONS WHY ORAL ARGUMENT SHOULD BE PERMITTED

Defendant-Appellee 7-Eleven, Inc. respectfully requests oral argument pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure and Rule 34(a) of the First Circuit Local Rules. This matter has been pending since 2017. Since then, the parties have engaged in extensive motion practice before the District Court, the Massachusetts Supreme Judicial Court, and the First Circuit Court of Appeals. Given the sheer volume of briefing, and the history of this case, 7-Eleven, Inc. believes that oral argument will be helpful to the Court and respectfully requests that Oral Argument be scheduled.

## STATEMENT OF THE ISSUES

Whether the District Court correctly held that the Plaintiff/Appellant franchisees ("Plaintiffs") failed to satisfy the threshold "services" inquiry for presumptive employee status (the "Threshold Inquiry") under the Massachusetts Independent Contractor Law, G.L. c. 149 § 148B (the "ICL"), where the undisputed facts demonstrated that Plaintiffs paid 7-Eleven for its services, and not the other way around.

2

## STATEMENT OF THE CASE

This is an appeal by five Plaintiffs: two individuals who own 7-Eleven franchises and three individuals who own companies that own 7 Eleven franchises. Plaintiffs are franchise owners who, in addition to their other business interests and significant real estate holdings, run multi-million dollar businesses with numerous employees and hundreds of thousands of dollars in annual income. This case is about Plaintiffs' efforts to transform the ICL into something it was never intended to be – a tool for business owners, like Plaintiffs, to recover as "damages" three times the value of their business's operating expenses, including their payroll and the fees they pay for their franchise rights.[1]

The District Court has now twice entered summary judgment for 7-Eleven. The procedural history of this case is as follows: Plaintiffs brought this action against 7-Eleven in Massachusetts state court in June 2017. JA43-54. In August 2017, 7-Eleven removed the matter to federal court. JA31-60. After discovery, the parties filed cross-motions

---

[1] For the sake of clarity, this case does not concern or impact the hourly employees that Plaintiffs hire to work in their stores. Those individuals are employed by the Plaintiffs or their corporations, and they receive all the benefits of Massachusetts' labor laws.

for summary judgment and the District Court allowed 7-Eleven's motion on the grounds that, in this case, the ICL conflicted with the Federal Trade Commission's ("FTC's") Franchise Rule, 16 C.F.R. § 436.1.  See Patel v. 7-Eleven, Inc., 485 F. Supp. 3d 299, 310 (D. Mass. 2020) (the "2020 Decision").

Plaintiffs appealed the 2020 Decision, and this Court certified the matter to the Massachusetts Supreme Judicial Court ("the SJC").  See Patel v. 7-Eleven, Inc., 8 F.4th 26 (1st Cir. 2021).  The SJC held that no conflict existed between the ICL and FTC Franchise Rule, Patel v. 7-Eleven, Inc., 489 Mass. 356, 365–66, 183 N.E.3d 398, 408 (2022), but provided additional guidance on other aspects of Massachusetts law that, the SJC believed, "would aid in the proper resolution of the issues presented here."  Id., 183 N.E.3d at 411, quoting Patel, 8 F.4th at 29. That guidance provided that:

> [D]istinguishing between legitimate arrangements and misclassification requires examination of the facts of each case, which begins with a threshold determination whether the putative employee "perform[s] any service" for the alleged employer. G. L. c. 149, § 148B. This threshold is not satisfied merely because a relationship between the parties benefits their mutual economic interests. See Jinks v. Credico (USA) LLC, 488 Mass. 691, 696, 177 N.E.3d 509 (2021). Nor is required compliance with Federal or State regulatory obligations enough, in isolation, to satisfy this threshold

4

> inquiry. See Sebago [v. Boston Cab Dispatch, Inc., 471 Mass. 329-331, 28 N.E.3d 1139, 1147-49 (2015)] (compliance with regulatory leasehold mandated by regulations was not dispositive in determining whether individual "performs any service" for putative employer).

Id., 183 N.E.3d at 411-12.

This Court remanded the matter to the District Court in the wake of the SJC's decision.  See Patel v. 7-Eleven, Inc., No. 20-1999, 2022 WL 4545497 (1st Cir. Apr. 25, 2022).  The District Court, after additional briefing by the parties, revisited summary judgment in light of the SJC's additional guidance.  On September 28, 2022, the District Court issued a decision (the "Decision," attached at pages ADD 1-15 of the Addendum to this Brief) awarding summary judgment to 7-Eleven for the second time.

The Decision held that Plaintiffs had failed, as a matter of law, to show they provide a "service" to 7-Eleven within the meaning of the ICL's Threshold Inquiry.  Relying on Sebago, the District Court held that Plaintiffs' various contract obligations, such as those governing store operating hours, inventory recording procedures, and uniform use, were not "services" within the meaning of the ICL because Plaintiffs were not paid to perform them.  Decision at 10-13; see also Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 327, 28 N.E.3d 1139, 1146 (2015).  The

District Court rejected Plaintiffs' argument that 7-Eleven's franchise fees, which Plaintiffs pay to 7-Eleven out of their stores' profits, satisfied the Threshold Inquiry because, "in Patel, the SJC reiterated that the services threshold is not met 'merely because a relationship between the parties benefits their mutual economic interests.'"  Decision at 13, quoting <u>Patel</u>, 183 N.E. 3d at 411.  This appeal followed.

## STATEMENT OF THE FACTS

Plaintiffs (or corporations they own) are 7-Eleven franchisees. Although they attempt to cast themselves as downtrodden store managers, the reality is far different. The record establishes that Plaintiffs are independent, savvy businessmen.  Most own several business ventures (including competing convenience stores), and they leverage the rights and services they purchase from 7-Eleven to create profitable (and, sometimes, extremely profitable) franchised businesses.

## I.    Plaintiffs And Their Businesses.

Four of the five Plaintiffs set up corporations for the purpose of owning and/or managing their 7-Eleven franchises.  Plaintiffs Niral Patel, Dhaval Patel, and Vatsal Chokshi each set up a corporate entity for the purpose of entering into a franchise relationship with 7-Eleven,

6

and each is an employee and officer of that entity. JA2806; JA2813; JA2974; JA3026.    Another Plaintiff, Dhananjay Patel, formed a management company ("Shree Corporation") to operate his 7-Eleven franchise. JA2929. Shree Corporation receives all the revenue the 7-Eleven franchise generates and, in turn, pays Mr. Patel a management fee. Id.

Plaintiffs also enjoy the advantages of being business owners — they have investors in their franchises, adjust corporate ownership structures, and take loans from their businesses.    For example, the entities that Niral Patel and Dhaval Patel chose to form were originally owned in part by another 7-Eleven franchisee, Dharmesh Patel. JA2979-80; JA3026-27. Dharmesh Patel had no role in the operations of either franchise, and both Dhaval and Niral Patel ultimately acquired Dharmesh Patel's ownership interest to become sole owners of their companies.    JA3037; JA2983-84.

Vatsal Chokshi is an owner and officer of two corporations he created for his 7-Eleven franchises (DP Jersey and DPNEWT01), and he receives a salary from each. JA2806; JA2813; JA2816.  Mr. Chokshi has varied the ownership structure of these corporations significantly over

the years.  For example, in 2015, Mr. Chokshi sold 20% of the stock in DP Jersey to his brother and another 40% to Dharmesh Patel. JA2802-05. He repurchased that stock in 2018. Id.  In 2015, Mr. Chokshi sold 50% of DP NEWT01 to Dharmesh Patel.  JA2810.  He repurchased that stock in 2017. Id. Mr. Chokshi also made loans to and took loans from the corporations at various times, in amounts ranging from approximately $160,000 to $275,000.  JA2803; JA2805.

Plaintiffs also conducted themselves as the business owners they are (and agreed they were when they entered into their franchise agreements).  See, e.g., JA745.  Each of the corporate franchisees filed corporate tax returns each year (JA2804; JA2988; JA3028; JA3142-60), and each of the individual franchisees filed tax returns stating that they were sole proprietors, not employees.  In these returns, Plaintiffs deducted the expenses they incurred owning and operating their 7-Eleven franchise from their taxable incomes. JA2929; JA2863-64.

Plaintiffs' repeated assertions that they are business owners are consistent with the significant discretion they exercise operating their businesses.  Indeed, while the specific controls exercised by 7-Eleven have no bearing on the legal principles at issue in this appeal, 7-Eleven

8

notes that Plaintiffs largely disclaimed their allegations of control during discovery. For example, Plaintiffs admitted they work when they want (JA2819; JA2886; JA2923; JA2983; JA3048), take vacations when they want (JA2822; JA2886-87; JA2947; JA2983; JA3048), and exercise total control over all their employment practices—including the hiring, firing, wages, discipline, scheduling, and staffing of their many employees. See, e.g., JA2813; JA2818-19; JA2859-60; JA2861; JA2920-21; JA2932; JA2975-76; JA3028; JA3045-47; JA3051. In addition, Plaintiffs determine how they want to merchandise their stores (JA2871; JA2944-45), how to price the products they choose to sell (JA2822-23; JA2868; JA2941; JA2997-98; JA3042; JA3048), which vendors they will use (JA2867; JA2939) and, to a certain degree, what equipment they will put in their stores (JA2943). They own their own business licenses, carry non-recommended inventory when they choose to, and participate in promotions only when they conclude they make sense for their businesses. JA2823-24; JA2869-71; JA2938; JA2942-45; JA2998-3000; JA3042.

Even if one were to set their 7-Eleven franchises aside, the record would still show that Plaintiffs are successful businessmen. For example:

9

- In 2011, Safdar Hussain acquired (through ASH, LLC, his wholly owned entity) a Sunoco gas station and a mini-mart franchise called APlus.  JA2855-57.  Mr. Hussain is also the President and owner of a perfume distribution company (Orchid Collections, LLC).  JA2883.

- Dhananjay Patel owns: (i) a non-7-Eleven convenience store (West Elm Variety), which he has owned and operated since 2014; (ii) income property (through his entity, Bhadravir Realty LLC) which is valued at $2.5 million; and (iii) through yet another entity (Shree Ji Real Estate, LLC) commercial real estate. JA2923, 2928-30.

- Vatsal Chokshi owned a Blimpie's® franchise and a drug testing company as well as a gas station and an unbranded convenience store. JA2795-96.

- Dhaval Patel owns another business (named DPMP LLC) which previously owned rental property. JA3029.

Finally, Plaintiffs' franchised businesses have been extremely profitable.  Dhananjay Patel testified at deposition that, due to his hard work and good business decisions, he grew his franchise's sales from less than $1 million to more than $2.1 million. JA2934. As a result of his efforts, Vatsal Chokshi was able to acquire a property worth more than $2 million (JA2811) and, in 2018, paid himself (directly or through disbursements made to his wholly owned corporations) $247,651 – excluding W-2 wages he took as an employee of his corporations and excluding tens of thousands of dollars of ordinary business income he chose not to disburse to himself.  JA2815-16.

10

## II.    How Franchising Works.[2]

Plaintiffs' brief begins with an assumption – unsupported by record evidence – that franchisees are nothing more than managers who work for their franchisors.  <u>See, e.g.</u>, Plaintiffs' Br. at 8.  They certainly are not. As the undisputed facts make clear, franchisees in general (and, as discussed in the previous section, 7-Eleven franchisees in particular) are independent business owners who, like other business owners, work for themselves, make their own employment decisions, and reap the profits (and bear the risk of loss) of the businesses they own.  To truly understand how misguided Plaintiffs' view is requires an understanding

---

[2]  The facts in this section are drawn from an affidavit submitted by Dean Francine Lafontaine, the Senior Associate Dean for Faculty and Research, and a Professor of Business Economics and Public Policy at the Ross School of Business at the University of Michigan. JA461-560.  Dean Lafontaine's academic research is in Industrial Organization, with a focus on franchising.    JA462.  7-Eleven submitted Dean Lafontaine's affidavit at summary judgment to provide the District Court with relevant information about franchising and the context in which 7-Eleven's business operates. Plaintiffs did not present any evidence to the District Court to dispute Dean LaFontaine's conclusions.  Instead, they objected to Dean Lafontaine's evidence on a variety of grounds.  <u>See</u> JA3225-49.  The District Court overruled Plaintiffs' objections in its 2020 Decision, 485 F. Supp. at 305–06, and Plaintiffs did not appeal this determination.  Dean Lafontaine's affidavit is thus a part of the record, and the facts it establishes are undisputed.

of what franchising is, how it works, and how 7-Eleven does business with Plaintiffs. 7-Eleven provides that context here.

Franchising has "existed in this country in one form or another for over 150 years," <u>Patterson v. Domino's Pizza, LLC</u>, 60 Cal. 4th 474, 333 P.3d 723, 733 (2014), and, more recently, has "become a ubiquitous, lucrative, and thriving business model." <u>Id.</u>, 333 P.3d at 725. There are two main forms of franchising: product franchising (e.g., car dealers and gasoline retailers) and business-format franchising (e.g., convenience stores like those owned and operated by 7-Eleven franchisees, restaurants, hotels, and gyms). JA475. In product franchising, the primary commodity exchanged is a tangible product that the franchisee resells to consumers; in business-format franchising, it is a license for the franchisee to distribute products or services using the franchisor's operating system. JA475-6.

The essence of business-format franchising is the replication of the franchisor's business concept by independent business owners who purchase the right to use the franchisor's brand, systems, and know-how for a period of time. JA480. Franchisees derive value from this franchise arrangement in at least three ways: (1) brand equity, which is the ability

of the brand to draw in customers to the franchisee's business, (2) access to economies of scale, and (3) system access, which is the franchisee's ability to benefit from the franchisor's intellectual property and know-how. JA481. Unlike employees, franchisees can increase profitability and income of the businesses they operate, and thereby develop equity in the value of the franchise which they can ultimately sell to other franchisees for a profit. JA481-82.

Franchisors receive compensation for the licenses, services, and know-how they provide their franchisees from fees they charge their franchisees. JA496-8, JA512. See also 16 C.F.R. § 436.1(h)(3) (defining a franchise relationship as one where "[a]s a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate."). This compensation takes the form of a combination of upfront fees and periodic royalties. JA514.

## III.   7-Eleven.

7-Eleven is the world's largest franchisor of retail convenience stores. JA590. It has been in business since 1927 and has been selling franchises in the United States for more than fifty years. Id. There are

13

currently more than 7,800 7-Eleven® stores operating in the United States, approximately 159 of which are franchised to independent business owners in Massachusetts. Id.; JA3176.[3]

7-Eleven's relationship with its franchisees conforms to the standard business format franchise model discussed in the previous section. JA496. 7-Eleven provides its franchisees with a variety of services, including training, a license to operate a store using 7-Eleven's trademarks and operating system, leasehold rights, bookkeeping,

---

[3] Plaintiffs state that "Japan has recognized that the 7-Eleven so-called 'franchisor-franchisee' relationship allows for 'systematic exploitation of some franchisees…'" Plaintiffs' Br. at 18, n.10. The quoted language does not appear on the cited record page (JA1262) and, in any case, Japanese 7-Eleven franchisees are franchisees of Seven & i Holdings—a a publicly traded company on the Nikkei stock exchange that is not a party to this litigation—not 7-Eleven, Inc. JA3178. More importantly, the courts in this country have routinely concluded that 7-Eleven's franchisees are independent contractors. See, e.g., Haitayan v. 7-Eleven, Inc., No. 21-56144, 2022 WL 17547805, at *1 (9th Cir. Dec. 9, 2022) (upholding trial verdict that 7-Eleven franchisors were independent contractors); 7-Eleven, Inc. v. Sodhi, Civ. Action No. 13-3715 (MAS) (JS), 2016 WL 3085897, at *7 (D.N.J. May 31, 2016) (holding that franchisees' counterclaim that he should be classified as an employee for purposes of the FLSA failed as a matter of law), aff'd, 706 F. App'x 777 (3d Cir. 2017); Singh v. 7-Eleven, Inc., No. C-05-04534 RMW, 2007 WL 715488, at *7 (N.D. Cal. Mar. 8, 2007); Wickham v. Southland Corporation, 168 Cal. App. 3d 49 (Cal. App. Ct. 1985) (affirming summary judgment determination that alleged controls did not create principal-agent relationship between 7-Eleven and franchisee).

maintenance and repair support, and advertising.  Decision at 12; JA475-76; JA526-27; JA600-3; JA617-18; JA3259.  7-Eleven employs over 3,700 corporate personnel, including over 1,000 field consultants, to provide these services to its franchisees.  JA496-97.

Not surprisingly, 7-Eleven does not do this work for free.  In return for the services 7-Eleven provides, 7-Eleven's franchisees pay 7-Eleven an upfront franchise fee and a periodic royalty (called the 7-Eleven Charge) based on a percentage of the franchise's gross profits.  Decision at 12-13 ("the franchisees pay franchise fees to 7-Eleven in exchange for a variety of services"); JA496; JA605-6; JA3259-60.  Like most business format franchisors, 7-Eleven divides the fees for its services this way to: (1) spread the cost of those services over the length of the contract rather than in one initial lump sum, (2) reassure its franchisees that 7-Eleven has an incentive to help them succeed, and (3) share its franchisees' risk of failure by absorbing a portion of the franchisees' losses in the event of a business downturn.  JA514-15.

What 7-Eleven does <u>not</u> do is "pay [its franchisees] for anything." Decision at 12.   Instead, 7-Eleven franchisees pay <u>themselves</u> by "withdraw[ing] weekly or monthly 'draws' from the store's gross profit

minus the 7-Eleven Charge and store expenses." Id., quoting 2020 Decision, 485 F. Supp. 3d at 303-04. Provided they maintain a minimum net worth, franchisees are entitled to all the gross profit that remains after paying the 7-Eleven Charge and other store expenses. JA3260. Like all business owners, franchisees can choose to pay themselves all their franchise profits or reinvest a portion of those profits in their business. See JA3261 (Vatsal Chokshi declined to disburse tens of thousands of dollars of franchise income to himself).

## SUMMARY OF THE ARGUMENT

Plaintiffs do not press their argument to the District Court that contractual obligations imposed by their franchise agreements are "services" within the meaning of the Threshold Inquiry. Instead, they (and the Commonwealth) rely on the argument that the Threshold Inquiry is satisfied because "7-Eleven's revenue is directly tied to the franchisees' work selling items in 7-Eleven's stores." Plaintiffs' Br. at 22. They are wrong. As this Brief explains, Plaintiffs' proposed Threshold Inquiry interpretation runs counter to existing case law, the SJC's guidance in this case, and common sense.

Part I (pp. 19-23) of this section disposes of three meritless technical arguments Plaintiffs raise.  First, the SJC did not, as Plaintiffs argue, bar the District Court from applying the Threshold Inquiry on remand.  In fact, it provided guidance (which the District Court followed) as to how the District Court <u>should</u> apply the Threshold Inquiry.  <u>See</u> <u>Patel</u>, 183 N.E.3d at 411.  Second, it is not true "that Massachusetts courts have uniformly recognized that franchisees provide services to franchisors…." Plaintiffs' Br. at 9.  Only one of the four cases Plaintiffs cite addresses the Threshold Inquiry, and that case did so in a context very different from the one here.  Finally, 7-Eleven did not "concede" the Threshold Inquiry before the District Court.  The language Plaintiffs claim to be a concession (which appears in a discovery motion) is 7-Eleven's description of Plaintiffs' own allegations.

With that done, Part II (pp. 23-42) of this brief turns to the crux of the dispute – the contention by both Plaintiffs and the Commonwealth that the Decision is at odds with existing precedents which supposedly hold that the Threshold Inquiry is satisfied whenever a defendant receives revenue as a result of a plaintiff's work.  <u>See</u> Plaintiffs' Br. at 22. The District Court read the precedents correctly; Plaintiffs and the

Commonwealth do not. Under controlling case law, the Threshold Inquiry (a) is satisfied where a defendant pays a plaintiff to do something that benefits the defendant, such as performing a service for the defendant's customer, and (b) is not satisfied where a plaintiff pays a defendant for rights and services the plaintiff needs to operate his or her own business. As the undisputed facts in this case follow pattern (b), and not pattern (a), the District Court's decision to enter summary judgment in 7-Eleven's favor was correct.

Part III (pp. 43-51) addresses the Commonwealth's textual argument. Although this argument was waived (Plaintiffs did not raise it below, so the Commonwealth cannot raise it now on their behalf) this section also explains how (a) one of the Commonwealth's definitions actually accords perfectly with the District Court's reading of the ICL, and (b) the Commonwealth's other proposed definition cannot possibly be what the Legislature intended—if it was, it would effectively criminalize the giving of favors in Massachusetts.

Part IV (pp. 51-54) addresses the policy arguments Plaintiffs and the Commonwealth advance to convince this Court to read the Threshold Inquiry into irrelevance. Their concerns are unfounded. As this section

18

explains, the SJC made clear in <u>Patel</u> that the Threshold Inquiry has a purpose – "distinguishing between legitimate arrangements and misclassification" – and the District Court's interpretation of the Threshold Inquiry logically distinguishes between "legitimate franchise relationships" and those "created and maintained in order to avoid the [ICL]." <u>Patel</u>, 183 N.E.3d at 411.  Plaintiffs' and the Commonwealth's interpretation, in contrast, would turn every franchise relationship into a presumptive employment relationship, which it precisely how the SJC held the ICL should <u>not</u> be interpreted.

Finally, Part V (pp. 55) explains why there is no reason to certify this matter to the Massachusetts Supreme Judicial Court a second time.

## ARGUMENT

## I.    Plaintiffs' Technical Arguments Are Meritless.

### A.    Patel Did Not Hold That The District Court Must Apply The ABC Test In This Case.

Plaintiffs' lead argument is that the SJC "already determined that the ABC test should apply here."  <u>See</u> Plaintiffs' Br. at 9; <u>see also</u> <u>id.</u> at 18, 21, 29.  Not so.  The only citation Plaintiffs provide for this statement is to page 371 of <u>Patel</u> (<u>see</u> Plaintiffs' Br. at 18), and that page actually states that the SJC "express[es] no opinion as to how the ABC test applies

19

to the facts of the present case." Patel, 183 N.E.3d at 412.  Nowhere on
that page, or in any other place in Patel, did the SJC so much as hint that
the District Court must apply the ABC test after remand.

To the contrary, as the District Court noted (see Decision at 10),
Patel offered "further guidance" on other "relevant aspect[s] of
Massachusetts law" that the SJC believed "would aid in the proper
resolution of the issues presented here." Id., 183 N.E.3d at 410; quoting
Patel, 8 F.4th at 29.  As previously discussed, one piece of guidance the
SJC provided was that "distinguishing between legitimate arrangements
and misclassification requires examination of the facts of each case, …
begin[ning] with a threshold determination of whether the putative
employee 'perform[s] any service' for the alleged employer." Id., 183
N.E.3d at 411, quoting G.L. c. 149, § 148B.  The SJC further clarified that
"[t]his threshold is not satisfied merely because a relationship between
the parties benefits their mutual economic interests … [n]or is required
compliance with Federal or State regulatory obligations enough, in
isolation, to satisfy this threshold inquiry." Id.  If the SJC had really
intended its decision to foreclose further argument on the Threshold
Inquiry, this guidance would have been unnecessary and irrelevant.

20

In any case, Plaintiffs never argued to the District Court that <u>Patel</u> somehow resolved the Threshold Inquiry against CNA. <u>See</u> JA3319-22, 3368. This argument is therefore waived. <u>See, e.g.</u>, <u>Kelly v. Riverside Partners, LLC</u>, 964 F.3d 107, 116 (1st Cir. 2020) ("Despite multiple hearings and rounds of briefing [. . .], Kelly did not raise this argument in the district court . . . . [T]his argument is waived.").

**B.    Massachusetts Courts Have Not "Uniformly Recognized" That Franchisees Provide Services To Franchisors.**

Plaintiffs next argue "that Massachusetts courts have uniformly recognized that franchisees provide services to franchisors in determining the franchisees to be employees of the franchisor." Plaintiffs' Br. at 9. Like Plaintiffs' previous argument, this grossly distorts the authority on which it purports to rely. Plaintiffs cite four decisions to support their argument: <u>Awuah v. Coverall North America, Inc.</u>, 707 F. Supp. 2d 80 (D. Mass. 2010), <u>Coverall North America, Inc. v. Com'r of Div. of Unemployment Assistance</u>, 447 Mass. 852, 858, 857 N.E.2d 1083, 1087-88 (2006), <u>DeGiovanni v. Jani-King Int'l</u>, No. 1:07-cv-10066 (Dkt. 208) (D. Mass. June 8, 2012), and <u>Da Costa v. Vanguard Cleaning Sys., Inc.</u>, 2017 WL 4817349 (Mass. Super. Sept. 29, 2017).

Plaintiffs' Br. at 9-10.  But three of these four decisions do not discuss the Threshold Inquiry at all.  <u>See</u> <u>Awuah</u>, 707 F. Supp. 2d at 83 (court's analysis confined to prong B of ABC test); <u>Coverall North America</u>, 857 N.E.2d at 1087-1088 (court's analysis confined to prong C of ABC test); <u>DeGiovanni</u>, No. 1:07-cv-10066 (Dkt. 208) at 1-2 (awarding summary judgment on prong B of ABC test without analysis).[4]  The fourth decision, <u>Da Costa</u>, does examine the Threshold Inquiry, but (as discussed in more detail below, <u>see</u> <u>infra</u> at 39-40), it applied that inquiry to a janitorial franchise system that bears no relation to the 7-Eleven system at issue here.  As discussed in the next section, these differences are dispositive.[5]  <u>See</u> <u>Patel</u>, 183 N.E.3d at 411 (application of Threshold Inquiry "requires examination of the facts of each case"); <u>see also</u> <u>Haitayan v. 7-Eleven, Inc.</u>, No. CV 17-7454 DSF (ASX), 2021 WL 4078727, at *17 (C.D. Cal.

---

[4] A copy of this unreported decision is attached at pp. 19-20 of the Addendum to this brief.

[5] Plaintiffs also cite cases from courts in other jurisdictions holding that franchisees can be employees. <u>See</u> Plaintiffs' Br. at 10, n. 1.  But none of these cases involve the Massachusetts ICL or the Threshold Inquiry that it requires.  <u>See</u> <u>Patel</u>, 183 N.E.3d at 411.  They also do not involve 7-Eleven, and courts throughout the country (including, most recently, the Ninth Circuit Court of Appeals) have routinely concluded that 7-Eleven's franchisees are independent contractors and not employees. <u>See</u> <u>supra</u> at 14, note 3.

22

Sept. 8, 2021) (noting "significant factual differences" between janitorial franchises and 7-Eleven franchises limiting applicability janitorial franchise cases to 7-Eleven's facts), aff'd sub nom. Haitayan v. 7-Eleven, Inc., No. 21-56144, 2022 WL 17547805 (9th Cir. Dec. 9, 2022).

### C.    7-Eleven Did Not Concede The Threshold Inquiry.

The trail argument in Plaintiffs' Brief is that 7-Eleven conceded that Plaintiffs provide a service to 7-Eleven in prior briefing to the District Court. See Plaintiffs' Br. at 32.  Plaintiffs tried to run this argument on the District Court twice, and both times the District Court—correctly—paid it no heed.  Read in context, the language Plaintiffs claim to be a concession (which appears in a discovery motion) is 7-Eleven's description of Plaintiffs' own allegations.  JA435-436.  In any case, Plaintiffs provide no authority for the proposition that phrasing in a discovery motion constitutes evidence admissible at summary judgment.

## II.    The Decision Tracks Existing Authority Interpreting The Threshold Inquiry.

The core of both Plaintiffs' and the Commonwealth's positions is their contention that the Decision runs contrary to the holdings of four cases – the SJC's decisions in Sebago and Jinks, Judge Woodlock's decision in Ruggiero v. American United Life Insurance Co., 137 F. Supp.

3d 104 (D. Mass. 2015), and the unreported state court decision in Da Costa. <u>See</u> Plaintiffs' Br. at 22-29, Amicus Br. at 13-17. This section explains why that core contention is wrong. In fact, the Decision is in full accord with <u>Sebago</u>, which actually holds that the Threshold Inquiry is <u>not</u> satisfied where, as here, a putative employee claiming to provide services to a putative employer is really just paying that putative employer for the rights and tools the putative employee needs to operate its own business. The Decision also accords with <u>Jinks</u>, because <u>Jinks</u> forecloses the argument that the Threshold Inquiry can be satisfied by evidence of a "flow of revenue directly from the worker's labor to the putative employer," Amicus Br. at 16. As for <u>Ruggiero</u> and <u>Da Costa</u>, both are distinguishable on their facts—they involve a traditional employment fact pattern where a company pays workers to perform services for the company's own customers. That fact pattern is not present here.

Finally, this section addresses an interpretation of the Decision unique to the Commonwealth's Brief. The Commonwealth accuses the District Court of improperly engaging in a "complex assessment of the relative weight of the services exchanged between the parties." Amicus

Br. at 10.  But as explained below, the District Court did nothing of the sort.  Far from engaging in a "complex assessment," the District Court simply performed the "require[d] examination of the facts"—which are undisputed in this case—and concluded based on those undisputed facts that the Threshold Inquiry was "not satisfied merely because a relationship between the parties benefits their mutual economic interests." Patel, 183 N.E.3d at 411.

### A.   Sebago

Plaintiffs argue that the District Court should have held that Plaintiffs provided services to 7-Eleven because they "pay franchise fees," and, therefore, "7-Eleven's revenue depends on Plaintiffs' work." Plaintiffs' Br. at 22 (capitalization and boldface omitted).  The Commonwealth similarly argues that, under Sebago, the ICL's service inquiry is satisfied whenever "revenue flow[s] from the worker to the putative employer."  Amicus Br. at 13.  These interpretations turn Sebago's actual holding on its head.  Before explaining why, however, it is helpful to unpack Sebago's nuanced analysis of the Threshold Inquiry, including the various defendant groups in Sebago and the Court's ruling as to each group.

25

1.    **The <u>Sebago</u> Defendants And How The SJC Applied The Threshold Inquiry To Each Of Them.**

<u>Sebago</u> involved misclassification claims brought by taxi drivers ("Drivers") against three groups of defendants: (1) "Medallion Owners," who owned both the taxicabs the Drivers used and the medallions that serve as licenses to operate them; (2) the "Radio Associations" who dispatched the drivers, and (3) a taxicab garage ("Garage") that serviced taxicabs. <u>Sebago</u>, 28 N.E.3d at 1142-1144. In section 2(b) of the <u>Sebago</u> decision, the SJC applied the Threshold Inquiry separately to each defendant group.

With respect to the Medallion Owners, the Drivers deployed the same argument Plaintiffs are running here – specifically, the Drivers argued that they provided services to the Medallion Owners because they paid the Medallion Owners to use their taxicabs and medallions, and, therefore, "without the [D]rivers' work, the [O]wners' medallions and taxicabs would be worthless." <u>Id.</u>, 28 N.E.3d at 1147. The SJC rejected this argument because it "prove[d] too much." <u>Sebago</u>, 28 N.E.3d at 1148. As the SJC explained, if accepted, this argument would transform <u>every</u> company that makes money by providing others with the means to

26

operate a business – for example, by leasing equipment, property, or licenses – into a presumptive employer:

> [C]ompanies spanning a vast array of industries commonly elect to lease, rather than purchase, equipment that is necessary to their business operations. Absent some controlling principles, all lessees would be deemed presumptive employees of their lessors.

Id., 28 N.E.3d at 1148.[6]

With respect to the Radio Associations, the SJC held that the Drivers did perform a service because they participated in the Radio Associations' corporate voucher programs. Id., 28 N.E.3d at 1149. These programs involved vouchers that the Radio Associations sold to their own corporate clients. When the Radio Association's clients used a taxi, they would submit the vouchers as payment to the Driver, the Driver would return the voucher to the Radio Association, and the Radio Association would pay the Driver "an amount equal to the fare and tip, minus a

---

[6] Plaintiffs argue in footnote 4 of their brief that "[t]he SJC ultimately determined that the drivers did not provide services to the medallion owners because '[t]he medallion owners are not concerned with the results of the plaintiffs' operations, as drivers are not required to remit a percentage of their revenues….'" Plaintiffs Br. at 11, n. 4, quoting Sebago, 28 N.E.3d at 1151. This is not accurate. The language Plaintiffs cite is not from the portion of Sebago addressing the Threshold Inquiry. It is from the portion of Sebago discussing Prong B of the ICL's ABC test. See id. Prong B is not at issue here.

'processing' fee…."  Id.  In other words, the Radio Associations earned money by selling vouchers for a service (a taxi ride) that the Radio Associations paid the Drivers to perform.

Finally, the SJC addressed the Garage, which earned revenue "from setting up and servicing taxicabs…."  Id.  Even though the Drivers operated the cabs that the Garage serviced, the SJC concluded "that plaintiffs clearly do not provide services to taxicab garages."  Id.

### 2.     7-Eleven Is Like The Medallion Owners in Sebago, Not The Radio Associations.

Both Plaintiffs and the Commonwealth argue that Plaintiffs provide services to 7-Eleven because "revenue flowing from the worker to the putative employer [is] a 'service' under [the ICL]."  Amicus Br. at 13; Plaintiffs' Br. at 22-23.  As support, both cite the same sentence from Sebago: "the revenue flowing to the radio association through the voucher program [wa]s directly dependent on the drivers' work of transporting passengers."  Plaintiffs' Br. at 23; Amicus Br. at 13-14, quoting Sebago, 28 N.E.3d at 1149.  But both misstate the "revenue" to which that sentence refers.  As the balance of the cited paragraph in Sebago makes clear, the "revenue" the SJC referenced in that sentence was not, as Plaintiffs and the Commonwealth would have it, "revenue flowing from

28

the workers….” Amicus Br. at 13. It was, instead, the revenue flowing to the Radio Associations <u>from their own “corporate clients</u>.” <u>Sebago</u>, 28 N.E.3d at 1149 (emphasis added).

As the District Court correctly recognized, this is a dispositive distinction. If revenue flowing from a worker to a putative employer were enough to trigger a presumptive employment relationship, then both the Medallion Owners in <u>Sebago</u> <u>and</u> the Radio Associations would be presumptive employers, because <u>Sebago</u> makes clear that the Drivers paid the Medallion Owners for the use of their cabs and medallions. <u>See</u> <u>id.</u>, 28 N.E.3d at 1145 (noting drivers “leased taxicabs and medallions from the medallion owners at flat rates”). This was, however, the exact result that the SJC rejected as “prov[ing] too much.” <u>Id.</u>, 28 N.E.3d at 1148.

Instead, the SJC held that the Threshold Inquiry had been satisfied for the Radio Associations, but not for the Medallion Owners. <u>Id.</u>, 28 N.E.3d at 1147-1149. These different outcomes resulted from the different revenue sources involved. Unlike the Medallion Owners (who earned money from the Drivers because the Drivers paid them for leasing rights), the Radio Associations earned money by selling ride vouchers <u>to</u>

29

their own clients. Those clients traded the vouchers to the Drivers for rides, and the Radio Associations "paid the taxi drivers when they redeemed their passengers' vouchers." Decision at 11, citing Sebago, 28 N.E.3d at 1149 (emphasis added). Put another way, unlike the Medallion Owners, who sold leasehold rights in their taxicabs to the Drivers themselves, the Radio Associations sold a service to their own customers and then paid the Drivers to perform it. This was, on its face, consistent with a typical employment relationship, where a customer pays a company for a service and the company pays a worker to perform that service for its customer. Accordingly, as the SJC explained, "the independent contractor test must be applied to determine whether the plaintiffs are employees…." Sebago, 28 N.E.3d at 1149.

As the District Court correctly recognized, the Radio Association fact pattern does not track 7-Eleven's relationship with its franchisees. Unlike the Radio Associations, "7-Eleven does not pay the franchisees for the performance of any obligations." Decision at 11. Moreover, unlike the Radio Associations, who used Drivers to service their own corporate clients, 7-Eleven does not use franchisees to provide services to its own customers. Instead, franchisees "operate their own stores," id. at 14,

30

shoppers purchase the franchisees' goods, see JA331 (franchisees own their store's inventory), and the franchisees collect the resulting profits, see JA3260 (franchisees own store's gross profits).[7]

Accordingly, the proper analog to the relationship between 7-Eleven and its franchisees is the Medallion Owner/Driver relationship in Sebago, not the Radio Association/Driver relationship. The Medallion Owners in Sebago earned their revenue by leasing equipment and license rights "necessary to [the Drivers'] business operations." Sebago, 28 N.E.3d at 1148. So to here—7-Eleven earns its revenue by "leas[ing] property and equipment to [its franchisees] and grant[ing its franchisees] a license to use 7-Eleven's trademarks and operating system." JA3259.[8]

_____

[7] To the extent 7-Eleven has customers, its customers are the franchisees who pay 7-Eleven for the license rights, leasehold rights, and services they use to operate their franchises. Decision at 12.

[8] In Sebago, the SJC noted in *dicta* that, because the Medallion Owners "sold advertising space on their taxicabs," driving their cabs "arguably could constitute a service [performed by the Drivers] to the owners insofar as it increased the value and facilitated the sale of advertising space." Sebago, 28 N.E.3d at 1149. There is no equivalent issue in this case. Nothing in the record suggests that 7-Eleven sold advertising space on Plaintiffs' stores to third parties, and Plaintiffs never argued to the District Court that any equivalent arrangement exists.

31

Indeed, Professor LaFontaine made that analogy explicit. As she explained:

> In many respects, a business format franchise relationship[9] is similar to a situation in which a business leases industrial machinery or office electronics to enhance its productivity. Like a business that leases productivity enhancements, a franchisee purchases a license from a business format franchisor not because she intends to resell that license to a consumer, but because the license will make the franchisee's business run more profitably.

JA476.

It is true that, because 7-Eleven earns revenue from fees paid by franchisees out of store profits, "without the [franchisees'] work, [7-Eleven's franchises] would be worthless." Sebago, 28 N.E.3d at 1147. But the same could be said of every company that sells services to business owners. For example, if Plaintiffs did not work in their stores, they would have no revenue from which to pay their stores' utility bills. And if Plaintiffs could not pay their store's utility bills, then the electricity and water connections to those stores would be worthless. No one, however, would suggest that this fact transforms Plaintiffs' utility companies into the Plaintiffs' presumptive employers. This is because,

---

9 "7-Eleven's relationship with its franchisees conforms to the standard business format franchise model." JA496.

as the SJC explained in <u>Sebago</u>, the revenue-based Threshold Inquiry interpretation advanced by Plaintiffs and the Commonwealth simply "proves too much." <u>Id.</u>, 28 N.E.3d at 1148.[10]

### 3. Plaintiffs Cannot Contest The 2020 Decision's Finding That 7-Eleven Does Not Pay Plaintiffs.

Plaintiffs also challenge the Decision's application of <u>Sebago</u> to the facts of this case by arguing that, when the District Court found 7-Eleven does not pay its franchisees, "it got the facts wrong…." Plaintiffs Br. at 23. It is far too late for Plaintiffs to make this argument. As the District Court noted, it determined that 7-Eleven does not pay its franchisees <u>in its 2020 Decision</u>. <u>See</u> Decision at 12, quoting 485 F. Supp. 3d at 303-04.

---

[10] The full implications of the Threshold Inquiry interpretation Plaintiffs and the Commonwealth advance here extend far beyond franchising, because <u>every</u> distribution relationship involves a revenue flow from a distributor, who sells the product, to a manufacturer, who creates the product. As Professor LaFontaine explained:

> [I]n *any* distribution system, a distributor's work is "necessary" to a manufacturer's business (and vice versa) just as a franchisee's work is "necessary" to a franchisor, and for the same reason: ultimately, the manufacturer's income depends on the distributor's ability to sell the manufacturer's product to consumers.

JA513 (emphasis in original). Accordingly, if the argument that Plaintiffs and the Commonwealth advance is correct, then in Massachusetts every manufacturer presumptively employs all its distributors.

33

Plaintiffs did not challenge that determination in their first appeal to this Court, see Opening Brief of Plaintiffs-Plaintiffs, No. 20-1999, 2021 WL 807805 (1st Cir., Feb. 16, 2021), and thus waived their right to challenge it now, see Labor Relations Div. v. Teamsters Local 379, 156 F.3d 13, 18 (1st Cir. 1998) ("When a party could have raised an argument in his initial appeal, and failed to do so, he has generally waived his right to raise that argument on remand or on appeal from remand.").

In any case, the franchise agreement language Plaintiffs cite as evidence of "pay" for the first time on appeal, see Plaintiffs' Br. at 23, actually relates to draws 7-Eleven franchisees may elect to take from their franchises' accounts, see JA108. Draws are not pay. See Patel v. 7-Eleven, Inc., No. 18 C 07010, 2019 WL 3554438, at *3 (N.D. Ill. Aug. 5, 2019) (holding that 7-Eleven's franchise draw system "is not a wage-payment arrangement"). In this record, it is undisputed that, subject to minimum net worth requirements, "Plaintiffs determine whether to take draws from their 7-Eleven accounts, and determine the amounts of those draws." JA3267. It is also undisputed that, so long as Plaintiffs maintained a minimum net worth, they were "entitled to all of the gross profits of the business that remain after paying the 7-Eleven

34

Charge and the store expenses," and thus could "pay themselves" whatever they wanted from those profits. JA3260. There is no evidence that 7-Eleven ever paid any Plaintiff anything, at any time, for any reason.

### B.  <u>Jinks</u>

Despite their protestations to the contrary, <u>Jinks</u> really does foreclose Plaintiffs' argument that they provide services to 7-Eleven because 7-Eleven's revenue depends on the profits made by Plaintiffs' stores. <u>See</u> Decision at 13. <u>Jinks</u> involved a direct marketing broker ("Credico") that contracted with a staffing company ("DFW") to provide door-to-door sales services for Credico's clients. <u>Jinks</u>, 177 N.E.3d at 513. DFW hired the plaintiffs (the "Sellers") as independent contractors and paid them to do the sales work. <u>Id.</u>, 177 N.E.3d at 513-14. Although the Sellers alleged that Credico directly employed them, on appeal they argued that the joint employment finding needed to create this direct relationship was unnecessary for ICL liability because, under the Threshold Inquiry, "an entity is an individual's employer so long as the individual is 'performing any service' from which the entity derives an economic benefit." <u>Id.</u>, 177 N.E.3d at 515. The SJC disagreed. It held

that even though Credico "derived an economic benefit from the third-party workers," it was not liable for misclassifying the Sellers because DFW, not Credico, was the Sellers' "direct employer."  Id., 177 N.E.3d at 516.

Jinks did address a different question than the one at issue here. In Jinks, there was no dispute that the Sellers provided services to someone, but the beneficiary of those services was unclear.  The beneficiary of the Sellers' services could have been Credico because the Sellers performed sales work for Credico's clients, or it could have been DFW, because the Sellers performed sales work for DFW's own client, Credico.  The SJC chose the latter option because it was DFW, not Credico, that contracted with and paid the Sellers.

The question in this case is different.  The question here is whether Plaintiffs provided a service to anyone, or, alternatively, worked for themselves.  But, as the District Court correctly recognized, while the question in Jinks was different, the answer the SJC provided in Jinks dictates the correct answer here.  Although Plaintiffs and 7-Eleven may have a "mutual economic interest" – because "both profit from the franchise stores' revenue" – under Jinks (and Patel, which cites Jinks,

36

183 N.E.3d at 411) "[t]hat mutual interest is not … sufficient to establish that plaintiffs perform services for 7-Eleven."  Decision at 13-14; see also Patel, 183 N.E.3d at 411 ("This threshold is not satisfied merely because a relationship between the parties benefits their mutual economic interests.").

The Commonwealth argues that Jinks "did not hold that the flow of revenue directly from the worker's labor to the putative employer is insufficient evidence of services."  Amicus Br. at 16.  In fact, it did.  The Sellers in Jinks were employed "as salespersons to work on various marketing campaigns in Massachusetts **for Credico's clients**."  Jinks, 177 N.E.3d at 513 (emphasis added).  Accordingly, Credico's revenue did flow directly from the Sellers' work, because if the Sellers had not done that work, Credico would not have gotten paid.  This forecloses the Commonwealth's contention that the Threshold Inquiry can be met merely by evidence of a "flow of revenue from the worker's labor to the putative employer..." Amicus Br. at 15.[11]

---

[11] If anything, the connection between Plaintiffs' work and 7-Eleven's revenues is even more attenuated than the revenue-work connection in Jinks.  The Jinks plaintiffs, like the Radio Associations in Sebago, performed a service for which the putative employer's own clients paid the putative employer.  As discussed in the previous section, that is not

C.  <u>Ruggiero</u>

<u>Ruggiero</u> applied the services inquiry to an insurance agent (the "Agent") who claimed he was misclassified by an insurance provider (the "Provider").  The Agent contracted to "recruit, train, and supervise" the Providers' agents and brokers, as well as to "solicit applications" for the Providers' insurance contracts.  <u>Ruggiero</u>, 137 F. Supp. 3d at 109.  In return, the Provider paid the Agent commissions and fees.  <u>Id.</u>  Without significant analysis, Judge Woodlock held that the Agent provided services to the Provider within the meaning of the ICL.  <u>Id.</u> at 113.  This is hardly surprising, as no conceivable "service" definition would exclude from its scope a relationship where the putative employer paid someone

---

the case here – Plaintiffs "operate their own stores," Decision at 14, and they sell goods to their own customers.  To the extent Plaintiffs or the Commonwealth are suggesting that the sales Plaintiffs make to their customers are connected to 7-Eleven's revenue simply because Plaintiffs use the revenue from those sales to pay 7-Eleven for the rights and services Plaintiffs use to operate their businesses, <u>see</u> Decision at 12, <u>Sebago</u> forecloses that argument.  As previously discussed, in <u>Sebago</u>, the SJC held that no service relationship existed between the Drivers and the Medallion Owners, even though the Drivers paid the Medallion Owners for the cabs and medallion licenses they needed to do their work.  This was true even though "without the [D]rivers' work, the [O]wners' medallions and taxicabs would be worthless."  <u>Sebago</u>, 28 N.E.3d at 1147.

to train its employees and solicit customers for its products.  7-Eleven does neither of those things.  <u>See, e.g.</u>, Decision at 11-12.

### D.  <u>Da Costa</u>

In <u>Da Costa</u>, a janitorial franchisor ("Vanguard") sold franchises to an intermediate company ("Ztico").  <u>Id.</u> at *1.  Vanguard solicited the cleaning customers and forwarded the customer leads to Ztico.  <u>Id.</u>  The <u>Da Costa</u> plaintiffs (the "Cleaners") then contracted "with Ztico to receive cleaning work."  <u>Id.</u> at *3.  Ztico would then "assign[] a cleaning schedule to the [Cleaners]," who would clean the customer's businesses under Vanguard's close supervision.  <u>Id.</u> at **6-7.  Ztico would then pay the Cleaners for their work.  <u>Id.</u> at *6.  Vanguard received a 4% cut of Zitco's gross revenue.  <u>Id.</u> at *1.

The <u>Da Costa</u> court's analysis of the Threshold Inquiry focused primarily on the three-tiered contractual relationship between the parties, and whether the Cleaners could provide services to Vanguard despite never having contracted with it.  <u>See id.</u> at **4-5. But the court's analysis did conclude with the following:

> The plaintiffs have performed a service for Vanguard. Vanguard's revenue is derived from initial franchise fees, four percent of the gross billings from work performed by unit franchisees, and various fees imposed on unit franchisees.

> Vanguard's revenue, therefore, is directly dependent on commercial cleaning work of the plaintiffs and other unit franchisees.

Id. at *5.  This conclusion, however, pertained to a relationship that, shorn of its contractual complications, looked very much like a typical employment relationship.  If one disregards the various corporate distinctions between the parties (as the Da Costa court did, see id. at **4-5), then one is left with a relationship where Vanguard and Ztico collectively solicited cleaning work from customers, assigned that work to individual Cleaners to perform, and then paid the Cleaners for their work.  As in Ruggiero, this process seems, on its face, indistinguishable from traditional employment.

Da Costa's fact pattern is a far cry from the fact pattern here.  In this case, it is Plaintiffs that have the customers, Plaintiffs who collect payment, and Plaintiffs who pay 7-Eleven for services rendered out of Plaintiffs' own profits.  Decision at 11-12; JA3259-61.  If Da Costa has any bearing here, it stands for the proposition that Plaintiffs presumptively employ 7-Eleven, not the other way around.

### E.    The Commonwealth Misreads The Decision.

The Commonwealth contends that the District Court rested its Threshold Inquiry analysis on "a complex assessment of the relative

weight of the services exchanged between the parties." Amicus Br. at 10. It did not.  Although the District Court did examine both the contract obligations Plaintiffs claimed were services under the ICL and the services 7-Eleven provides to its franchisees, <u>see</u> Decision at 11-12, no assessment of relative weight, complex or otherwise, appears anywhere in the Decision.  Nor did the District Court somehow "flip" the Threshold Inquiry, Amicus Br. at 9, when it pointed out that 7-Eleven provides services to Plaintiffs and not the other way around, Decision at 11-12.

What the District Court <u>did</u> do was follow the SJC's instructions in <u>Patel</u> for "distinguish[ing] between legitimate arrangements and misclassification…." <u>Id.</u>, 183 N.E.3d at 411.  It did this by conducting an "examination of the facts" bearing on the "threshold determination whether the putative employee 'perform[s] any service' for the alleged employer." <u>Id.</u>, quoting G. L. c. 149, § 148B.  That examination properly focused on the parties' Franchise Agreement and the undisputed fact that "7-Eleven does not pay the plaintiffs for anything." Decision at 12.  And that examination led to a straight-forward conclusion:

> The record demonstrates that [Plaintiffs] are not paid for any services performed for 7-Eleven.  In contrast, the franchisees pay franchise fees to 7-Eleven in exchange for a variety of services to support the franchisee.

Id. at 13.

As the District Court correctly held, these facts do not describe an employment relationship, presumptive or otherwise. They describe "a legitimate franchise relationship between 7-Eleven and the individual plaintiffs who operate their own stores." Id. at 14; accord Patel, 183 N.E.3d at 411 ("nothing in the independent contractor statute prohibits legitimate franchise relationships among independent entities that are not created to evade employment obligations under the wage statutes").[12]

---

[12] The District Court's finding that the facts of this case describe a legitimate franchise arrangement tracks the unrebutted expert testimony of Dean Lafontaine. As Dean Lafontaine explained:

> **In a standard employer/employee relationship, the employer pays the employee money in exchange for the employee's services.** As should be apparent from the preceding discussion of franchising, however, this is not how the relationship between a business format franchisor and a franchisee works and, specifically, it is not the nature of 7-Eleven's relationship with its franchisees. As discussed above, in a business format franchise relationship, a franchisor provides its franchisees with a license to use the franchisor's branded business concept (whose value the franchisor commits to protect), as well as its intellectual property that is embodied in the operational training and ongoing operational support. In return, the franchisees pay the franchisor money and promise to operate their businesses in a manner consistent with brand standards. In other words, **in a**

## III. Plaintiffs Waived The Commonwealth's Textual Argument And, In Any Case, The Decision Accords With One Of The Commonwealth's Definitions.

The Commonwealth accuses the District Court of failing to analyze the "plain meaning" of the statutory phrase "perform any service" because it did not consider dictionary definitions when resolving the services inquiry. Amicus Br. at 4. It is true that the District Court did not analyze any definitions, but that is because nobody asked it to. Instead, as the District Court noted, "[b]oth parties rel[ied] upon the obligations outlined in the Franchise Agreement to bolster their services inquiry arguments." Decision at 11; see also JA3317-25; 3367-76 (textual argument absent from Plaintiffs' District Court papers).

Plaintiffs' failure to present a textual argument to the District Court forecloses the Commonwealth's attempt to raise that argument for them. "It is clearly established that arguments not raised at the district court level will not be considered on appeal." Timberland Design, Inc. v. First Service Bank for Savings, 932 F.2d 46, 51 (1st Cir. 1991). That rule

---

        **franchising relationship, the franchisor provides services to its franchisees in exchange for payment, not the other way around.**

JA495-96 (emphasis added).

applies with equal force to amici.  <u>Dalombo Fontes v. Gonzales</u>, 498 F.3d 1, 2 (1st Cir. 2007) ("we will not address an issue raised by an amicus that was not seasonably raised by a party to the case").  The Commonwealth's definitional argument has, therefore, been waived.

Nevertheless, it is worth discussing why the Commonwealth's definitional argument is misguided.  The basic problem with the Commonwealth's position arises from the fact that the two "service" definitions it proffers mean two different things.  While one aligns perfectly with the District Court's analysis, the other (which the Commonwealth apparently prefers) creates an unworkable and nonsensical result.

## A.  The Commonwealth's First Definition Aligns With The District Court's Interpretation Of The ICL.

The Commonwealth's first definition, "employment in duties or work for another," Amicus Br. at 5 (quoting The American Heritage Dictionary 1121 (2d ed. 1982)), equates "service" with "employment."  To "employ," in turn, means "[t]o provide work to (someone) **for pay**," The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=employ (last visited May 23, 2023) (emphasis added), ADD. 16-17.  This is <u>exactly</u> what the

District Court understood the term "services" to mean. As the Decision makes clear, the dispositive fact in the District Court's Threshold Inquiry analysis was that "**7-Eleven does not pay the plaintiffs for anything**." Decision at 12 (emphasis added).

Two other sources confirm that this definition is the one the Legislature intended. First, defining "services" as work for pay aligns with a "services" definition the Legislature has used elsewhere. See G.L. c. 64H § 1 (defining "services" as "activities engaged in by a person for another person **for a consideration**" (emphasis added)). That fact suggests that the work-for-pay definition was the one the Legislature intended to use here. See Commonwealth v. Cooper, 91 Mass. App. Ct. 595, 602, 77 N.E.3d 324, 329 (2017) ("The Legislature is presumed to be aware of the meaning it has ascribed to terms it has used in other statutes, particularly in relation to similar subjects."). Second, analogizing services with employment meshes with the SJC's own description of the ICL's purpose. See Patel, 183 N.E.3d at 404 ("ICL's purpose is "to protect workers by classifying them as **employees**, and thereby grant them the benefits and rights of **employment**, where the circumstances indicate that they are, in fact, **employees**," quoting

Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 620, 990 N.E.2d 1054, 1066 (2013) (emphasis added).

Accordingly, if the ICL really does incorporate the Commonwealth's first "service" definition, and "service" equates with work performed for pay, then the fact that 7-Eleven does not pay Plaintiffs anything entitles 7-Eleven to judgment as a matter of law on the services inquiry. And this is precisely what the District Court held. Decision at 14-15.

## B. The Commonwealth's Second Definition Criminalizes Favors.

The Commonwealth's alternative "service" definition, "an act of assistance or benefit to another or others; favor," Amicus Br. at 5 (quoting The American Heritage Dictionary 1121 (2d ed. 1982), is clearly the one the Commonwealth prefers. See Amicus Br. 9 ("a worker who does **any act** that assists or benefits the putative employer 'perform[s]' a 'service,' thereby triggering the presumption that the worker is an employee," emphasis added). The problem with this second definition is that it is potentially boundless – if the second definition is correct, then in Massachusetts even a favor creates a presumption of employment.

A familiar scenario illustrates the problem. Assume that, after hearing argument on this case, you draft an opinion and ask another

judge to review it as a "favor."  The American Heritage Dictionary 1121 (2d ed. 1982).  As this favor "assists or benefits" you, Amicus Br. at 9, by the Commonwealth's logic your colleague's act of good will transforms you into a presumptive employer.  See, e.g., Jinks, 177 N.E.3d at 520 ("Section 148B(a) provides that 'an individual performing any service ... shall be considered to be an employee … unless three factors are established to rebut this presumption of employment").  Accordingly, unless you pay your colleague a minimum wage for his or her "service," you risk criminal liability.  See, e.g., Monell v. Boston Pads, LLC, 471 Mass. 566, 577, 31 N.E.3d 60, 69 (2015) ("failure to properly classify individual as employee and to comply with other provisions of Wage Act or Fair Minimum Wage Law subjects [the] employer to criminal penalties," citing G.L. c. 149, § 148B(d)).

It gets worse.  You may think that, even if your colleague's favor makes you a presumptive employer, you will still not face criminal liability because you can satisfy the ICL's ABC test.  But you may well be wrong about that.  Prong B of the ICL's ABC test asks whether "the service is performed outside the usual course of the business of the employer…."  G.L. c. 149, § 148B(a)(2).  Is reviewing a draft judicial

opinion outside your usual course of business?  Probably not, and if the answer to that question really is no, then you cannot satisfy the ABC test and you are, in fact, criminally liable.  See, e.g., Patel, 183 N.E.3d at 404-05 ("If any one of the [ABC test's] criteria is not shown, the statute directs that the individual is an employee for purposes of our wage statutes and entitled to the protections set forth therein.").  Might there be some exception to the ABC test here because both you and your colleague work for the federal judiciary?  Maybe, but there is no precedent on that question, and the mere fact that you might have to litigate it shows the absurd breadth of the Commonwealth's interpretation.

The ridiculousness of this scenario demonstrates why the Commonwealth's first definition of service – "employment in duties or work for another," Amicus Br. at 5 – must be the correct one.  As set forth above, "employment" denotes pay, and limiting the "services" covered by the ICL to those done for pay, as the District Court did here, see Decision at 12-13, both protects the relationships the Legislature intended the ICL to cover and excludes those it clearly did not.  On the other hand, extending the ICL's scope to "any act that assists or benefits the putative employer," Amicus Br. at 9, including a "favor," id. at 5, produces an

obviously absurd result.  The Court should therefore reject it.  <u>See, e.g.</u>, <u>Attorney General v. School Committee of Essex</u>, 387 Mass. 326, 336, 439 N.E.2d 770, 777 (1982) ("We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable.").

### C.  <u>AMIWoodbroke</u> Does Not Support The Commonwealth's Interpretation.

The Commonwealth suggests that <u>Comm'r of Revenue v. AMIWoodbroke, Inc.</u>, 418 Mass. 92, 634 N.E.2d 114 (1994) supports its "services" position.  It does not.  In <u>AMIWoodbroke</u>, the SJC referenced a pair of dictionary definitions, "an act done for the benefit or at the command of another," and "action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something," to interpret the term "services" in G.L. c. 63, § 33 (1992 ed.) and G.L. c. 63, § 39A (1992 ed.).  <u>AMIWoodbroke,</u> 634 N.E.2d at 115.  But context matters.  The statutes at issue in <u>AMIWoodbroke</u> defined taxable corporate income,[13] and the question was whether taxable interest

---

[13] The relevant statutory language stated "[t]he net income of a ... corporation which is a subsidiary of another corporation ... shall be determined ... by including fair compensation to such ... corporation for

income should be imputed to subsidiaries who made interest-free loans to their parents.  As the SJC pointed out, because the purpose of those statutes was "to make adjustments to correct the effect of less than arm's length transactions" on taxable income, the interest-free loans provided by the subsidiaries in that case were "precisely the sort of transactions" the statutes were intended to cover.  Id., 634 N.E.2d at 116.  Put another way, the statutes the SJC interpreted in AMIWoodbroke were designed to regulate favors – favors performed by corporate subsidiaries for their parents in an effort to avoid tax consequences.  The ICL, in contrast, is not concerned with regulating or criminalizing favors.  It is concerned with "the benefits and rights of employment" where "circumstances indicate that [workers] are, in fact, employees…."  Patel, 183 N.E.3d at 404, quoting Depianti, 990 N.E.2d at 1066.

### D. The Term "Any" In The ICL Does Not Change The Analysis.

The Commonwealth also argues that the Legislature's insertion of the term "any" before "services" means every type of assistance or benefit must count as a service.  Amicus Br. at 6.  This is irrelevant because, as

---

all commodities sold to or services performed for the parent corporation or affiliated corporations."  AMIWoodbroke, Inc., 634 N.E.2d at 115, n.2.

set forth above, a "service" is work performed for pay, and it is undisputed that "7-Eleven does not pay the plaintiffs for <u>anything</u>." Decision at 12 (emphasis added). But, in any case, the SJC has repeatedly rejected the Commonwealth's contention that <u>every</u> benefit counts as a service under the ICL. <u>See, e.g.</u>, <u>Patel</u>, 183 N.E.3d at 412 (compliance with regulatory obligations is not service); <u>Jinks</u>, 177 N.E.3d at 515–16 (rejecting argument that Threshold Inquiry is satisfied by "'any service' from which the entity derives an economic benefit"); <u>Sebago</u>, 28 N.E.3d at 1147-48 (rejecting argument that "drivers provided a service because, without the drivers' work, the owners' medallions and taxicabs would be worthless").

## IV. The Sky Is Not Falling – The District Court's Decision Accords With The ICL's Purpose.

Both Plaintiffs and the Commonwealth argue that the District Court's Decision, if upheld, will bring about a misclassification apocalypse. Plaintiffs claim that "[a]llowing the District Court's decision to stand would open the floodgates for mischievous employers to misclassify workers but create payment structures that allowed them to evade application of the ABC test." Plaintiffs' Br. at 31. Likewise, the Commonwealth claims that, "[i]f affirmed, the District Court's reasoning risks imposing a chilling effect on misclassification cases across the labor

51

market in Massachusetts." Amicus Br. at 20. Both claims are, frankly, nonsense.

To begin with Plaintiffs' argument, the Court will note that Plaintiffs do not actually explain <u>how</u> "mischievous employers" could use the Decision to "create payment structures that allow[] them to evade application of the ABC test." Plaintiffs' Br. at 31. That is because they cannot. As discussed above, the essence of the Decision's holding is that Plaintiffs do not provide services to 7-Eleven because 7-Eleven does not pay them to do anything. <u>See</u> Decision at 12-13. Because real employees do not work for free, no real employer, no matter how mischievous, could possibly reorder its business in a way that eliminates pay.

The Commonwealth makes a different, but equally unfounded, apocalyptic argument. According to the Commonwealth, the Decision "substantially increases the low burden necessary to trigger the presumption of employee status by requiring workers not only to establish that they perform any service, but also to prove that their service outweighs any services performed by the employer." Amicus Br. at 19. It does nothing of the sort. As discussed in the previous section, the District Court did not, in fact, engage in any type of "weighing" of

services.  The Decision simply holds that a plaintiff cannot transform a defendant into a presumptive employer without first proving that the defendant paid the plaintiff to do something.  This is hardly an onerous burden.  Indeed, the District Court's formulation does not even exclude all franchise relationships – franchise relationships where a franchisor pays its franchisees to service the franchisor's own customers (like the one in Da Costa, see supra at 39-40) remain covered.

The SJC has already explained, in this very case, that the Threshold Inquiry was not intended to be toothless.  It has a purpose— "distinguishing between legitimate arrangements and misclassification…."  Patel, 183 N.E.3d at 411.  The District Court's Decision represents a logical reading of the Threshold Inquiry that effectively sorts "legitimate franchise relationships" that "are important to the economic wellbeing of the Commonwealth" from those—like the one in Da Costa, see supra, at 39-40—that mimic paid employment and seem "created and maintained in order to avoid the [ICL]."  Patel, 183 N.E.3d at 411.

The Threshold Inquiry interpretation pushed by Plaintiffs, on the other hand, makes the sorting described by Patel impossible.  Every

53

franchise relationship entails the payment of fees by the franchisee to the franchisor, because those fees are part of the "franchise" definition under the FTC's Franchise Rule, 16 C.F.R. § 436.1(h) (defining a "franchise" as a commercial relationship where, among other things, "[a]s a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate."). Accordingly, if a "financial relationship," Plaintiffs' Br. at 25, really is enough, on its own, to trigger a presumption of employment, then all franchisors are presumptive employers and the Threshold Inquiry has no role to play in distinguishing between legitimate franchise arrangements and misclassification. As this result contradicts the guidance the SJC provided in this very case, see Patel, 183 N.E.3d at 411, it cannot be correct.

Plaintiffs no doubt disagree with the District Court's Decision. Indeed, it is easy to understand why a plaintiffs' lawyer would want to fashion a world where performing "any act that assists or benefits" someone, Amicus Br. at 9, even a "favor," id. at 5, creates a potential lawsuit. But nothing the SJC or Legislature has ever said suggests this was what the ICL was supposed to do.

54

## V.      There Is No Need To Involve The SJC A Second Time.

Both Plaintiffs and the Commonwealth ask this Court to certify this matter to the SJC again rather than decide it.  There is no reason to do that.  Certification to the SJC is appropriate only when "there is no controlling precedent in the decisions of [the SJC]."  Supreme Judicial Court Rule 1:03(1).  That is not the case here.  Not only has the SJC already provided "guidance" in this case on the exact issue in dispute here, see Patel, 183 N.E.3d at 411 (Threshold Inquiry "is not satisfied merely because a relationship between the parties benefits their mutual economic interests"), it has also issued two prior decisions examining the Threshold Inquiry in detail, see Jinks, 177 N.E.3d at 515-16, Sebago, 28 N.E.3d 1147-1149.  As those precedents control, there is no reason to delay resolving this case for yet another appeal.  See U.S. Steel v. M. DeMatteo Const. Co., 315 F.3d 43, 54 (1st Cir. 2002) (certification unnecessary where "there is nothing novel or unsettled about Massachusetts law").

## CONCLUSION

For these reasons, this Court should affirm the Decision.

DATED:  May 26, 2023          By its attorneys,


/s/ Matthew J. Iverson
Matthew J. Iverson (BBO No. 653880)
NELSON MULLINS RILEY &
SCARBOROUGH LLP
One Financial Center
Suite 3500
Boston, MA 02111
(617) 217-4700
matthew.iverson@nelsonmullins.com

Norman M. Leon
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-4000
Norman.Leon@dlapiper.com

Patricia C. Zapata
DLA PIPER LLP (US)
51 John F. Kennedy
Short Hills, NJ 07078
(973) 520-2543
Patricia.Zapata@dlapiper.com


*Counsel for Defendant-Appellee 7-Eleven,
Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in the applicable Federal Rules of Appellate Procedure including Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains no more than 11,008 words. I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in a 14-point Century Schoolbook font.

Dated: May 26, 2023

*/s/ Matthew J. Iverson*
Matthew J. Iverson

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew J. Iverson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on May 26, 2023, and there are no non-registered participants.

<u>/s/ Matthew J. Iverson</u>
Matthew J. Iverson

58

# <u>Table of Contents – Addendum</u>

<u>Patel v. 7-Eleven</u>, No. 17-11414, Sept. 28, 2022 Summary
Judgment Decision ......................................................................... ADD. 1

American Heritage Dictionary "Employ" Definition ..................ADD. 16

<u>DeGiovanni v. Jani-King Int'l</u>, No. 21-56144, June 8, 2012
Summary Judgment Order ...........................................................ADD. 19

G.L. c. 63, § 33 (1992 ed.) .............................................................ADD. 21

G.L. c. 63, § 39A (1992 ed.)...........................................................ADD. 24

G.L. c. 64H § 1 ..............................................................................ADD. 28

G.L. c. 149 § 148B.........................................................................ADD. 34

16 C.F.R. § 436.1 ...........................................................................ADD.36

Supreme Judicial Court Rule 1:03(1) ..........................................ADD. 40

**United States District Court**
**District of Massachusetts**

```
_____
                        )
Dhananjay Patel, et al.,  )
                        )
        Plaintiffs,      )
                        )
        v.              )        Civil Action No.
                        )        17-11414-NMG
7-Eleven, Inc., et al., )
                        )
        Defendants.     )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises from a putative class action brought by five 7-Eleven, Inc. ("7-Eleven" or "defendant") franchise store owners and operators, Dhananjay Patel, Safdar Hussain, Vatsal Chokshi, Dhaval Patel and Niral Patel (collectively "plaintiffs"). Plaintiffs brought this putative class action on behalf of themselves and a putative class of similarly situated individuals in the Commonwealth of Massachusetts.

Plaintiffs allege that 7-Eleven (1) misclassified the franchisees as independent contractors instead of employees in violation of the Massachusetts Independent Contractor Law, Mass. Gen. L. c. 149, § 148B (Count I) and (2) has violated the Massachusetts Wage Act, Mass. Gen. L. c. 149, § 148 (Count II). Plaintiffs also initially alleged that 7-Eleven violated the

Massachusetts Minimum Wage Law, Mass. Gen. L. c. 151, §§ 1, 7 (Count III) but voluntarily withdrew that claim in July, 2020.

Pending before the Court on remand from the First Circuit Court of Appeals are the parties' cross motions for summary judgment and plaintiffs' motion for class certification. Because this dispute stretches back over five years and has been the subject of opinions of this Court, the First Circuit Court of Appeals and the Massachusetts Supreme Judicial Court, only the relevant background is included below.

I.    **Background**

    **A.    The Parties**

7-Eleven is a Texas corporation with its principal place of business in Texas.  It both sells convenience store franchises and operates its own corporate stores.  There are approximately 160 franchisee-operated 7-Elevens in Massachusetts.

The named plaintiffs own and operate 7-Eleven franchises in the Commonwealth, where they reside.  Two of the named plaintiffs, Dhananjay Patel and Sadar Hussain, entered into franchise agreements directly with 7-Eleven.

The remaining three named plaintiffs entered into franchise agreements with 7-Eleven on behalf of separate corporate entities: Niral Patel on behalf of DP Milk Street, Inc., Dhaval Patel on behalf of DP Tremont Street, Inc., and Vatsal Chokski

ADD. 2

on behalf of both DP Jersey, Inc. and DPNEWTO1, Inc.  These
plaintiffs receive their salaries from the respective corporate
franchisees.

**B.   The Franchise Agreements**

To establish each franchise location, the plaintiffs
entered into franchise agreements ("the Franchise Agreement")
with 7-Eleven.  Dhananjay Patel and Sadar Hussain signed these
agreements as individuals while Niral Patel, Dhaval Patel and
Vatsal Chokski executed the agreements on behalf of their
respective corporations.

The Franchise Agreement, which is substantively identical
in all cases, grants franchisees the license and right to
operate a 7-Eleven store.  It outlines in detail the obligations
and covenants that both 7-Eleven and the franchisees agree to
fulfill when an individual purchases a 7-Eleven franchise store.
Section 2 of the Franchise Agreement, for example, provides that
the franchisee agrees "to hold [itself] out to the public as an
independent contractor."

The franchisee promises to pay several fees to 7-Eleven
both upon execution of the Franchise Agreement and throughout
the franchisor-franchisee relationship.  In Section 3, the
franchisee agrees to pay 7-Eleven a franchise fee, initial
gasoline fee and down payment.  Section 10(a) outlines the "7-

Eleven Charge", a fee 7-Eleven collects in exchange for providing the 7-Eleven License.

> 7-Eleven Charge. You agree to pay us the 7-Eleven Charge for the License, the Lease and our continuing services. The 7-Eleven Charge is due and payable each Collection Period with respect to the Receipts from the Collection Period at the time the deposit of those Receipts is due. . . . You may not withhold Receipts or prevent payment of the 7-Eleven Charge to us on the grounds of the alleged non-performance or breach of any of our obligations to provide services to you or any other obligations to you under this Agreement or any related agreement.

## C.    Procedural Background

In June, 2017, plaintiffs filed this class action in Massachusetts Superior Court for Middlesex County and in August, 2017, defendant removed the case to this Court on diversity grounds.

After this Court denied defendant's motion to dismiss, 7-Eleven counterclaimed for: (1) declaratory judgment that the plaintiffs' franchise agreements are void (Counterclaim I); (2) breach of contract (Counterclaim II); and (3) contractual indemnity (Counterclaim III).  Additionally, 7-Eleven filed third-party complaints against DPNEWTO1, Inc., DP Tremont Street, Inc., DP Milk Street, Inc. and DP Jersey, Inc., the four corporations on behalf of which a named individual plaintiff signed a Franchise Agreement with 7-Eleven.  This Court denied

plaintiffs' motion to dismiss the counterclaims and the third-party complaints in September, 2019.

In March, 2020, both parties filed cross motions for summary judgment and plaintiffs filed their motion for class certification.  This Court allowed summary judgment in favor of defendant, 7-Eleven.

Plaintiffs appealed the summary judgment decision to the First Circuit Court of Appeals, which certified a question of law to the Massachusetts Supreme Judicial Court ("the SJC") in August, 2021.  See Patel v. 7-Eleven, Inc., 8 F.4th 26 (1st Cir. 2021) ("[W]e consider the most prudent approach to be to give the SJC the first opportunity to weigh in on this issue.").  The certified question was:

> Whether the three-prong test for independent
> contractor status set forth in Mass. Gen. Laws ch. 149
> § 148B applies to the relationship between a
> franchisor and its franchisee, where the franchisor
> must also comply with the FTC Franchise Rule?

Id.  In March, 2022, the SJC answered the certified question, explaining that the Massachusetts ICL both applies to the franchisor-franchisee relationship and does not conflict with the federal franchisor disclosure requirements in the FTC Franchise Rule. Patel v. 7-Eleven, Inc., 183 N.E.3d 398 (Mass. 2022).  The First Circuit Court of Appeals then vacated the

decision of this Court and remanded the case for further proceedings.

In July, 2022, the parties submitted supplemental briefing in support of their pending cross motions for summary judgment and plaintiffs' motion for class certification. The deadline for all remaining discovery is December 30, 2022, and trial is scheduled to commence in late January, 2023.

## II.  **Motion for Summary Judgment**

### A.    **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co._, 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc._, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact

in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most hospitable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law, then summary judgment is warranted. Celotex Corp., 477 U.S. at 322-23.

**B.    The Massachusetts Independent Contractor Law ("the Massachusetts ICL")**

Massachusetts considers "an individual performing any service" for another to be an employee, unless the purported employer can rebut that presumption. Mass. Gen. L. c. 149, § 148B(a).  To do so, the employer must prove the three conjunctive elements of an independent contractor relationship:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

      (2) the service is performed outside the usual course
         of the business of the employer; and,

      (3) the individual is customarily engaged in an
         independently established trade, occupation,
         profession or business of the same nature as that
         involved in the service performed.

Id. at § 148B(a)(1)-(3) ("the ABC Test").  If an employer is unable to satisfy any prong, then the individual is classified as an employee. Sebago v. Bos. Cab Dispatch, Inc., 28 N.E.3d 1139, 1146 (Mass. 2015).

### C.  Arguments of the Parties

7-Eleven argues that the Massachusetts ICL does not apply because (1) plaintiffs cannot meet the threshold inquiry that franchisees perform services for 7-Eleven because 7-Eleven in fact provides services to the franchisees in exchange for payment and (2) 7-Eleven is not the direct employer of Dhaval Patel, Niral Patel or Vatsal Chokshi because their separate corporate entities signed Franchise Agreements with 7-Eleven and thus 7-Eleven is, at a minimum, not liable for any alleged misclassification as to those plaintiffs.  Furthermore, 7-Eleven contends that plaintiffs have not incurred any Wage Act damages because the SJC deemed franchise fees legal in Patel v. 7-Eleven, Inc., 183 N.E.3d 398 (Mass. 2022).

Plaintiffs respond that (1) the Massachusetts ICL applies because plaintiffs do perform services for 7-Eleven, (2) the

existence of plaintiffs' corporations does not render the Massachusetts ICL inapplicable and (3) the SJC opinion in <u>Patel</u> does not invalidate plaintiffs' Wage Act claim.

**D.  Application**

**1.  Resolving the Services Inquiry on Summary Judgment**

As an initial matter, 7-Eleven again reiterates in its supplemental briefing that plaintiffs do not provide services to it, and thus cannot meet the threshold inquiry for the Massachusetts ICL to apply, while plaintiffs, not surprisingly, dispute that contention.

The threshold inquiry to determine if an individual is deemed an employee under the Massachusetts ICL is whether the "individual perform[s] any service" for the alleged employer. Mass. Gen. L. c. 149, § 148B(a).  "Service" is construed liberally to effectuate the remedial purpose of the statute in "protect[ing] employees from being deprived of the benefits enjoyed by employees through their misclassification." <u>Somers</u> v. <u>Converged Access, Inc.</u>, 911 N.E.2d 739, 749 (Mass. 2009).

This Court initially declined to enter summary judgment for defendant on this ground after considering (1) plaintiffs' argument that the services inquiry is a low threshold issue, (2) the competing allegations and various contractual obligations of both parties and (3) the language of the Franchise Agreement.

The SJC has, however, provided additional guidance on the threshold inquiry when it resolved the First Circuit's certified question in this matter. See Patel, 183 N.E.3d at 411. The SJC explained:

> This threshold is not satisfied merely because a relationship between the parties benefits their mutual economic interests. Nor is required compliance with Federal or State regulatory obligations enough, in isolation, to satisfy this threshold inquiry.

Id. (citing Jinks v. Credico (USA) LLC, 177 N.E.3d 509, 515-16 (Mass. 2021); Sebago, 28 N.E.3d at 1147-48). This additional guidance is instructive in analyzing whether plaintiffs have satisfied their burden of demonstrating that they do in fact perform services for 7-Eleven. See Patel, 183 N.E.3d at 404 ("Once the individual has shown the performance of services for the putative employer, the alleged employer may rebut the presumption by establishing [the ABC test] by a preponderance of the evidence."). With this guidance in mind, this Court will proceed to analyze the record to determine if plaintiffs can satisfy the threshold inquiry.

### 2. Whether Plaintiffs Perform "Services" for 7-Eleven

7-Eleven continues to assert that the plaintiff franchisees pay it, the franchisor, for the provision of services. It denies the suggestion that 7-Eleven pays the plaintiffs for any services.

Both parties rely upon the obligations outlined in the Franchise Agreement to bolster their services inquiry arguments. Plaintiffs contend that the covenants in the Franchise Agreement constitute services that they perform for 7-Eleven.  For example, plaintiffs discuss Section 19 of the Franchise Agreement, in which they promise to work full time in the store, operate the store 24 hours a day, record inventory sales, wear approved uniforms and use the 7-Eleven payroll system. Plaintiffs also refer to certain financial obligations outlined in Section 12, such as preparing and submitting a cash report and depositing receipts, as services performed for 7-Eleven.  In response, defendant stresses that these contractual obligations are not, on their own, services performed for an employer within the meaning of the Massachusetts ICL.

Rather, defendant cites Sebago for the proposition that services are obligations performed by employees in exchange for payment.  In Sebago, the SJC held that the plaintiff taxi drivers did perform a service for the defendant radio associations, because the radio associations paid the taxi drivers when they redeemed their passengers' vouchers that were purchased from the radio association. 28 N.E.3d at 1149.  In the case at bar, however, 7-Eleven does not pay the franchisees for the performance of any alleged obligations.  In fact, the

opposite is true, because 7-Eleven actually provides the franchisees with services in exchange for franchise fees.

Defendant renders the following services: both initial and ongoing training programs, including access to the 7-Eleven Operations Manual (Section 4), the grant of a license to operate the 7-Eleven store at the specified location (Section 7), bookkeeping records and payroll software (Section 12), store audits (Section 14), maintenance of 7-Eleven equipment and performance of store repairs (Section 20) and advertising services (Section 22).  Per Section 15, 7-Eleven also

> procure[s] the initial inventory [for the franchisees,] help[s] [them] clean and stock the store [and] provide[s] other services to prepare the store to open for business.

In return for such services, plaintiffs pay 7-Eleven a franchise fee and down payment (Section 3) and pursuant to Section 10 of the Franchise Agreement, they "agree to pay [7-Eleven] the 7-Eleven Charge for the License, the Lease and [7-Eleven's] continuing services."  As this Court previously found, 7-Eleven does not pay the plaintiffs for anything.

> 7-Eleven does not pay franchisees a salary.  Instead, franchisees may withdraw weekly or monthly "draws" from the store's gross profit minus the 7-Eleven Charge and store expenses.

Patel v. 7-Eleven, Inc., 485 F. Supp. 3d 299, 303-04 (D. Mass. 2020).

The Court remains unconvinced that the plaintiffs'
contractual obligations outlined in the Franchise Agreement
alone are enough to constitute services under the Massachusetts
ICL.  The record demonstrates that they are not paid for any
services performed for 7-Eleven.  In contrast, the franchisees
pay franchise fees to 7-Eleven in exchange for a variety of
services to support the franchisee.

### 3.  Plaintiffs' Revenue Argument

Plaintiffs suggest that because the revenue flowing to 7-
Eleven is directly dependent on their stores' revenue, they
provide services to 7-Eleven.  That theory was, however,
rejected by the SJC twice in the past year, both in Patel and
Jinks.  In Jinks,

> the plaintiffs urge[d] that an entity is an
> individual's employer so long as the individual is
> "performing any service" from which the entity derives
> an economic benefit [and the SJC remarked that it
> already] rejected such an approach in Depianti v. Jan-
> Pro Franchising.

177 N.E.3d at 515-16 (citing 990 N.E.2d 1054 (Mass. 2013)).
Further, in Patel, the SJC reiterated that the services
threshold is not met "merely because a relationship between the
parties benefits their mutual economic interests." 183 N.E.3d at
411.  Plaintiffs and 7-Eleven do have mutual economic interests,
as both profit from the franchise stores' revenue.  That mutual

-13-
**ADD. 13**

interest is not, however, sufficient to establish that
plaintiffs perform services for 7-Eleven.

> The SJC insisted in <u>Patel</u> that

> nothing in the independent contractor statute
> prohibits legitimate franchise relationships among
> independent entities that are not created to evade
> employment obligations under the wage statutes.

183 N.E.3d at 411 (citing An Advisory from the Attorney
General's Fair Labor Division on M.G.L. c. 149 § 148B 2008/1,
https://www.mass.gov/ doc/an-advisory-from-the-attorney-
generals-fair-labor-division-on-mgl-c-149-s-148b-
20081/download).  Here, 7-Eleven's mutual economic interests
with the plaintiff franchisees in the stores' sales and revenue
are inherent in legitimate franchise relationships.  The
Franchise Agreement sets forth a legitimate franchise
relationship between 7-Eleven and the individual plaintiffs who
operate their own stores.  The Massachusetts ICL does not
prohibit those relationships, and thus, the mere fact that the
parties share economic interest does not imply that plaintiffs
perform services for 7-Eleven.

The Court, thus, rejects the notion that plaintiffs perform
services for 7-Eleven.  The franchisees, who pay franchisor 7-
Eleven for a plethora of services, are merely fulfilling their

contractual obligations.  The Court will, therefore, allow summary judgment in defendant's favor on both remaining counts.

Having so concluded, plaintiffs' motions for summary judgment on 7-Eleven's liability for misclassification and class certification will be denied.  7-Eleven's counterclaims and third-party claims for (1) declaratory judgment that the various franchise agreements are void; (2) breach of contract; and (3) contractual indemnity are not the subject of any summary judgment motion and, therefore, remain pending.

**ORDER**

For the foregoing reasons, defendant 7-Eleven, Inc.'s motion for summary judgment (Docket No. 112) is **ALLOWED.** Plaintiffs' motions for summary judgment and class certification (Docket Nos. 117, 118) are **DENIED.**

The parties are directed to submit a joint status report on defendant's pending counterclaims against plaintiffs and third-party defendants on or before Wednesday, October 19, 2022.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 28, 2022







# HOW TO USE THE DICTIONARY

To look up an entry in *The American Heritage Dictionary of the English Language,* use the search window above. For best results, after typing in the word, click on the "Search" button instead of using the "enter" key.

Some compound words (like *bus rapid transit, dog whistle,* or *identity theft*) don't appear on the drop-down list when you type them in the search bar. For best results with compound words, place a quotation mark before the compound word in the search window.

[guide to the dictionary](#)



# THE USAGE PANEL

The Usage Panel is a group of nearly 200 prominent scholars, creative writers, journalists, diplomats, and others in occupations requiring mastery of language. Annual surveys have gauged the acceptability of particular usages and grammatical constructions.

[The Panelists](#)



# AMERICAN HERITAGE DICTIONARY APP

The new American Heritage Dictionary app is now available for [iOS](#) and [Android.](#)



# THE AMERICAN HERITAGE DICTIONARY BLOG

The articles in our [blog](#) examine new words, revised definitions, interesting images from the fifth edition, discussions of usage, and more.

**THE 100 WORDS**

**ADD. 16**

See word lists from the best-selling 100 Words Series!

Find out more!



## INTERESTED IN DICTIONARIES?

Check out the Dictionary Society of North America at http://www.dictionarysociety.com

**em·ploy** (ĕm-ploi□)

Share:    Tweet

*tr.v.* **em·ployed, em·ploy·ing, em·ploys**
**1.**
**a.** To provide work to (someone) for pay: *agreed to employ the job applicant.*
**b.** To engage the attention or activity of; occupy: *employed himself for an hour reading blogs.*
**2.** To put (something) to use or service: *employed a pen to open the package; employed her skills in the new job.*
**3.** To devote (time, for example) to an activity or purpose: *employed several months in learning Swahili.*
*n.*
**1.** The state of being employed: *in the employ of the city.*
**2.** *Archaic* An occupation.

[Middle English *emploien,* from Old French *emploier,* from Latin *implicāre,* to involve : *in-,* in; see EN-[1] + *plicāre,* to fold; see **plek-** in the Appendix of Indo-European roots.]

**em·ploy′a·bil□i·ty** *n.*
**em·ploy□a·ble** *adj.*
**em·ploy□er** *n.*

The American Heritage® Dictionary of the English Language, Fifth Edition copyright ©2022 by HarperCollins Publishers. All rights reserved.

# Indo-European & Semitic Roots Appendices

Thousands of entries in the dictionary include etymologies that trace their origins back to reconstructed proto-languages. You can obtain more information about these forms in our online appendices:

Indo-European Roots

Semitic Roots

The Indo-European appendix covers nearly half of the Indo-European roots that have left their mark on English words. A more complete treatment of Indo-European roots and the English words derived from them is available in our Dictionary of Indo-European Roots.

# American Heritage Dictionary Products



The American Heritage Dictionary, 5th Edition

The American Heritage Dictionary of Idioms

The American Heritage Roget's Thesaurus

Curious George's Dictionary

The American Heritage Children's Dictionary

- **CONTACT US**
- Customer Service
- Make Me An Author
- Ebooks Help with Glose Reader
- **ABOUT US**
- Company Profile
- Leadership Team
- Corporate Social Responsibility
- HarperCollins Careers
- HarperCollins Imprints
- HarperGreen
- Social Media Directory
- Accessibility
- **FOR READERS**
- Browse Reading Guides
- **FOR AUTHORS**
- Submit a Manuscript
- Report Piracy
- Agent Portal
- **MEDIA**

- Publicity Contacts
- Press Room
- **SERVICES**
- HarperCollins Speakers Bureau
- Library Services
- Academic Services
- Desk & Exam Copies
- Review Copies
- OpenBook API
- Marketing Partnerships
- **COVID-19 RESOURCES & PERMISSIONS**
- Permissions for Adult Online Readings
- Permissions for Kids Online Readings
- **SALES & RIGHTS**
- Booksellers & Retailer Ordering
- HarperCollins Catalogs
- Permissions
- Subsidiary Rights

- Media Rights and Content Development
- **GLOSE APP**
- iPhone
- Android
- **GLOBAL DIVISIONS**
- HarperCollins US
- HarperCollins Canada
- HarperCollins Christian
- HarperCollins Australia
- HarperCollins India
- HarperCollins UK

HarperCollins Publishers

News Corp

Terms of Use • Terms of Sale • Your Ad Choices • Privacy Policy • California Privacy Policy

Do Not Sell My Personal Information

Copyright 2022 HarperCollins Publishers All rights reserved.

*This website is best viewed in Chrome, Firefox, Microsoft Edge, or Safari. Some characters in pronunciations and etymologies cannot be displayed properly in Internet Explorer.

ADD. 18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VINCENT DE GIOVANNI,              )
MARIETTE BARROS, DIAMANTINO       )
FERNANDES, MARIA PINTO, and       )
all others similarly situated,    )
     Plaintiffs,                  )
                                  )
     v.                           )      C.A. No. 07-10066-MLW
                                  )
JANI-KING INTERNATIONAL, INC.,    )
JANI-KING, INC., and              )
JANI-KING OF BOSTON, INC.,        )
     Defendants.                  )

ORDER

WOLF, D.J.                                        June 8, 2012

     For the reasons described in detail in court on June 6, 2012,
it is hereby ORDERED that:

     1. The plaintiffs' Motion for Summary Judgement regarding prong
two of the misclassification test, Mass. Gen. Laws ch. 149,
§148B(a)(2) (Docket No. 184) is ALLOWED.

     2. The defendants' Motion for Summary Judgment regarding prong
two of the misclassification test (Docket No. 189) is DENIED.

     3. The defendants' Motion to Decertify Class (Docket No. 187)
is DENIED.

     4. By July 20, 2012:

     (a) The parties shall confer and report whether any
agreement has been reached to resolve this case.

     (b) If the case is not settled, the parties shall report
whether they wish to participate in mediation to be conducted by a
magistrate judge, by this court, or by a private mediator.

**ADD. 19**

(c) If the case is not settled and the parties do not wish to engage in mediation, they shall submit, jointly if possible and separately if necessary, a proposed schedule for future proceedings in this case.

6. If necessary, a scheduling conference shall be held on August 6, 2012 at 4:00 p.m. Representatives of each party with full settlement authority shall attend.

/s/ Mark L. Wolf<br>
UNITED STATES DISTRICT JUDGE

2

**ADD. 20**

# Massachusetts Statutes Annotated - 1992

M.G.L.A. 63 § 33

MASSACHUSETTS GENERAL LAWS ANNOTATED

PART I. **ADMINISTRATION OF THE GOVERNMENT**

TITLE IX. **TAXATION**

CHAPTER **63**. TAXATION OF CORPORATIONS

DOMESTIC CORPORATIONS

**§ 33**. Taxation of subsidiaries or affiliated corporations

The net income of a domestic business corporation which is a subsidiary of another corporation or closely affiliated therewith by stock ownership shall be determined by eliminating all payments to the parent corporation or affiliated corporations in excess of fair value, and by including fair compensation to such domestic business corporation for all commodities sold to or services performed for the parent corporation or affiliated corporations. For the purposes of determining such net income, the commissioner may, in the absence of satisfactory evidence to the contrary, presume that an apportionment by reasonable rules of the consolidated net income of corporations participating in the filing of a consolidated return of net income to the federal government fairly reflects the net income taxable under this chapter, or may otherwise equitably determine such net income by reasonable rules of apportionment of the combined income of the subsidiary, its parent and affiliates or any thereof.

If, in the opinion of the commissioner, the capital of a domestic business corporation, which is a subsidiary of another corporation or closely affiliated therewith by stock ownership, is inadequate for its business needs apart from credit extended or indebtedness guaranteed by the parent or an affiliated corporation, the commissioner shall, in determining net worth under paragraph 8 of **section** thirty, determine the value of its net worth properly taxable thereunder and consider such value the taxable net worth, disregarding its indebtedness owed to or guaranteed by the parent or an affiliated corporation.

Such a domestic business corporation shall incorporate in the tax returns required under **section** eleven of chapter sixty-two C such information as the commissioner may reasonably require for determination of the excise pursuant to the provisions of this **section**, and failure to so incorporate such information shall subject the corporation and its officers to the penalties provided by **section** seventy-four of chapter sixty-two C.

1988 Main Volume Credit(s)

Amended by St.1933, c. 303, **§** 1; St.1962, c. 756, **§** 6; St.1966, c. 698, **§** 54; St.1976, c. 415, **§** 31.

HISTORICAL NOTES

HISTORICAL AND STATUTORY NOTES

1988 Main Volume Historical and Statutory Notes

St.1919, c. 355, **§** 2.

St.1920, c. 549, **§** 1.

St.1922, c. 492, **§** 1.

St.1933, c. 303, **§** 1, approved June 28, 1933, and by **§** 3 made effective as of Jan. 1, 1933, and applicable to taxes assessed and payable in 1933 and thereafter, rewrote the **section**, which prior thereto read:

"If a domestic business corporation which is a subsidiary of a foreign corporation or closely affiliated therewith by stock ownership is so managed that, because of payments made to such other corporation or its officers in excess of the fair value

of the property or services given therefor, its books of account will not show its true earnings, it shall pay as a minimum tax under this chapter an amount equal to one tenth of one per cent of the said corporation's gross receipts for the taxable year from business assignable to this commonwealth as defined in clause six of **section** thirty-eight, unless it shall file, within ten days of a notice by the commissioner of his determination to assess the corporation under this **section**, a statement of its net income showing to the satisfaction of the commissioner its true earnings for the taxable year, eliminating therefrom all payments to such other corporation or its officers in excess of the fair value of the property or services given therefor."

St.1962, c. 756, **§** 6, approved July 25, 1962, and by **§** 12 made effective with respect to taxable years ending on and after Dec. 31, 1962, deleted a second paragraph which read:

"If in the opinion of the commissioner the capital of a domestic business corporation, which is a subsidiary of another corporation or closely affiliated therewith by stock ownership, is inadequate for its business needs apart from credit extended or indebtedness guaranteed by the parent or an affiliated corporation, the commissioner shall, in determining the corporate excess, determine the value of the capital truly employed by such domestic business corporation and consider such value the value of its capital stock disregarding its indebtedness owed to or guaranteed by the parent or an affiliated corporation, and the corporate excess thus determined shall in such case constitute the corporate excess taxable under the provisions of this chapter."

St.1966, c. 698, **§** 54, approved Sept. 6, 1966, and by **§** 87 made applicable to taxable years ending on and after Dec. 31, 1966, inserted the second paragraph.

St.1976, c. 415, **§** 31, by **§** 116 made effective Jan. 1, 1977, in the third paragraph, substituted references to "**section** eleven of chapter sixty-two C" and "**section** seventy-four of chapter sixty-two C" for "**section** thirty-five" and "**sections** forty-six, forty-nine and fifty", respectively.

St.1976, c. 415, **§** 31, was approved Oct. 15, 1976. Emergency declaration by the Governor was filed on the same date.

Related Laws:

For provisions relating to the surtax imposed by St.1969, c. 546, **§§** 18 and 21, see the Historical Note under **§** 32 of this chapter.

## REFERENCES

### CROSS REFERENCES

#### 1988 Main Volume Cross References

Tax on foreign subsidiaries, see **§** 39A of this chapter.

### CODE OF MASSACHUSETTS REGULATIONS

#### 1988 Main Volume Code of Massachusetts Regulations

Foreign sales corporations (FSCs), see 830 CMR **63**.38G.2.

### LAW REVIEW COMMENTARIES

#### 1988 Main Volume Law Review Commentaries

Worldwide unitary taxation in Massachusetts. Stephen M. Politi and Frederick K. Uttley (1984) 3 J. State Taxation 25.

### LIBRARY REFERENCES

#### 1988 Main Volume Library References

Taxation ⚷=382.

ADD.22

C.J.S. Taxation § 450.

Comments.

Corporate taxation in Massachusetts, see M.P.S. vol. 13A, Peairs, § 689.

Income component of the corporation excise tax, see M.P.S. vol. 4, Bailey and Van Dorn, § 161 et seq.

Property component of the corporation excise tax, net worth measure of the tax, Massachusetts and foreign corporations, see
M.P.S. vol. 4, Bailey and Van Dorn, § 147.

### UNITED STATES SUPREME COURT

#### 1988 Main Volume United States Supreme Court

Unitary-business principle, taxation of corporate subsidiaries, see ASARCO, Inc. v. Idaho State Tax Com'n, 1982, 102 S.Ct. 3103, 458 U.S. 307, 73 L.Ed.2d 787, rehearing denied 103 S.Ct. 275, 459 U.S. 961, 74 L.Ed.2d 213; F.W. Woolworth, Co. v. Taxation and Revenue Dept., 1982, 102 S.Ct. 3128, 458 U.S. 354, 73 L.Ed.2d 819, rehearing denied 103 S.Ct. 274, 459 U.S. 961, 74 L.Ed.2d 213.

**End of Document**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Massachusetts Statutes Annotated - 1992

M.G.L.A. 63 § 39A

MASSACHUSETTS GENERAL LAWS ANNOTATED

PART I. **ADMINISTRATION OF THE GOVERNMENT**

TITLE IX. **TAXATION**

CHAPTER 63. TAXATION OF CORPORATIONS

FOREIGN CORPORATIONS

§ 39A. Tax on foreign subsidiary corporation

 The net income of a foreign corporation which is a subsidiary of another corporation or closely affiliated therewith by stock ownership shall be determined by eliminating all payments to the parent corporation or affiliated corporations in excess of fair value, and by including fair compensation to such foreign corporation for all commodities sold to or services performed for the parent corporation or affiliated corporations. For the purposes of determining such net income, the commissioner may, in the absence of satisfactory evidence to the contrary, presume that an apportionment by reasonable rules of the consolidated net income of corporations participating in the filing of a consolidated return of net income to the federal government fairly reflects the net income taxable under this chapter, or may otherwise equitably determine such net income by reasonable rules of apportionment of the combined income of the subsidiary, its parent and affiliates or any thereof.

 If, in the opinion of the commissioner, the capital of a foreign corporation, which is a subsidiary of another corporation or closely affiliated therewith by stock ownership, is inadequate for its business needs apart from credit extended or indebtedness guaranteed by the parent or an affiliated corporation, the commissioner shall, in determining net worth under paragraph 9 of section thirty, determine the value of its net worth properly taxable thereunder and consider such value the taxable net worth, disregarding its indebtedness owed or guaranteed by the parent or an affiliated corporation.

 Such a corporation shall incorporate in its tax return required under section eleven of chapter sixty-two C such information as the commissioner may reasonably require for determination of the excise pursuant to the provisions of this section, and failure to so incorporate such information shall subject the corporation and its officers to the penalties provided by section seventy-four of chapter sixty-two C.

1988 Main Volume Credit(s)

Amended by St.1933, c. 303, § 2; St.1934, c. 134; St.1962, c. 756, § 9; St.1966, c. 698, § 62; St.1976, c. 415, § 33.

HISTORICAL NOTES

HISTORICAL AND STATUTORY NOTES

1988 Main Volume Historical and Statutory Notes

St.1922, c. 492, § 2.

 As appearing in G.L.1932 (Ter.Ed.), this section read:

 "The provisions of section thirty-three imposing a minimum tax upon domestic business corporations in certain cases shall, in like cases, apply to foreign corporations with respect to the carrying on or doing of business by them in the commonwealth."

 St.1933, c. 303, § 2, approved June 28, 1933, and by § 3 made effective as of Jan. 1, 1933 and applicable to taxes assessed and payable in 1933 and thereafter, rewrote the section to read:

"The net income of a foreign corporation which is a subsidiary of another corporation or closely affiliated therewith by stock ownership shall be determined by eliminating all payments to the parent corporation or affiliated corporations in excess of fair value, and by including fair compensation to such parent corporation for all commodities sold to or services performed for the parent corporation or affiliated corporations. For the purposes of determining such net income, the commissioner may, in the absence of satisfactory evidence to the contrary, presume that an apportionment by reasonable rules of the consolidated net income of corporations participating in the filing of a consolidated return of net income to the federal government fairly reflects the net income taxable under this chapter, or may otherwise equitably determine such net income by reasonable rules of apportionment of the combined income of the subsidiary, its parent and affiliates or any thereof.

"If in the opinion of the commissioner the capital of a foreign corporation, which is a subsidiary of another corporation or closely affiliated therewith by stock ownership, is inadequate for its business needs apart from credit extended or indebtedness guaranteed by the parent or an affiliated corporation, the commissioner shall, in determining the corporate excess employed within the commonwealth, determine the value of the capital truly employed by such foreign corporation and consider such value the value of its capital stock disregarding its indebtedness owed to or guaranteed by the parent or an affiliated corporation, and the corporate excess employed within the commonwealth as thus determined shall in such case constitute the corporate excess taxable under the provisions of this chapter.

"Such a corporation shall incorporate in its tax return required under section forty such information as the commissioner may reasonably require for determination of the excise pursuant to the provisions of this section, and failure to so incorporate such information shall subject the corporation and its officers to the penalties provided by sections forty-six, forty-nine and fifty."

St.1934, c. 134, an emergency act, approved April 6, 1934, substituted "foreign corporation" for "parent corporation" where this secondly appears in the first sentence of the first paragraph.

St.1962, c. 756, § 9, approved July 25, 1962, and by § 12 made effective with respect to taxable years ending on and after Dec. 31, 1962, deleted the second paragraph.

St.1966, c. 698, § 62, approved Sept. 6, 1966, and by § 87 made applicable to taxable years ending on and after Dec. 31, 1966, inserted the second paragraph.

St.1976, c. 415, § 33, by § 116 made effective Jan. 1, 1977, in the third paragraph, substituted references to "section eleven of chapter sixty-two C" and "section seventy-four of chapter sixty-two C" for "section forty" and "sections forty-six, forty-nine and fifty", respectively.

St.1976, c. 415, § 33, was approved Oct. 15, 1976. Emergency declaration by the Governor was filed on the same date.

Related Laws:

For provisions relating to the surtax imposed by St.1969, c. 546, §§ 18 and 21, see the Historical Note under § 32 of this chapter.

REFERENCES

CROSS REFERENCES

1988 Main Volume Cross References

Assessment of tax on combined income of certain corporations, option of corporations, see § 32B of this chapter.
Taxation of domestic corporations, subsidiaries or affiliated corporations, see § 33 of this chapter.

CODE OF MASSACHUSETTS REGULATIONS

1988 Main Volume Code of Massachusetts Regulations

Foreign sales corporations (FSCs), see 830 CMR 63.38G.2.

## LAW REVIEW COMMENTARIES

### 1988 Main Volume Law Review Commentaries

Worldwide unitary taxation in Massachusetts. Stephen M. Politi and Frederick K. Uttley (1984) 3 J. State Taxation 25.

## LIBRARY REFERENCES

### 1988 Main Volume Library References

Taxation ☞382, 397.
C.J.S. Taxation §§ 428, 450.
Comments.

Income component of corporation excise tax, see M.P.S. vol. 4, Bailey and Van Dorn, § 170 et seq.
Property component of corporation excise tax, network worth measure of the tax, Massachusetts and foreign corporations, see M.P.S. vol. 4, Bailey and Van Dorn, § 147.

## UNITED STATES SUPREME COURT

### 1988 Main Volume United States Supreme Court

Unitary-business principle, taxation of corporate subsidiaries, see ASARCO, Inc. v. Idaho State Tax Com'n, 1982, 102 S.Ct. 3103, 458 U.S. 307, 73 L.Ed.2d 787, rehearing denied 103 S.Ct. 275, 459 U.S. 961, 74 L.Ed.2d 213; F.W. Woolworth, Co. v. Taxation and Revenue Dept., 1982, 102 S.Ct. 3128, 458 U.S. 354, 73 L.Ed.2d 819, rehearing denied 103 S.Ct. 274, 459 U.S. 961, 74 L.Ed.2d 213.

## ANNOTATIONS

### NOTES OF DECISIONS

Determination of net income 1 ................................ enter p
Filing consolidated return 2 .................................. enter p

1. Determination of net income

Commissioner of Revenue did not lawfully apply unitary business approach to determining state taxable net income of corporation in 1979 and 1980, because the Commissioner had not adopted any regulations applicable to those years for so determining net income. Polaroid Corp. v. Commissioner of Revenue (1984) 472 N.E.2d 259, 393 Mass. 490.

Legislature did not intend by its amendment of this section governing taxation of foreign subsidiary corporations to grant authority to Commissioner of Revenue to engage in determining corporation's state taxable net income by the unitary business approach of combining income of all affiliated corporations and determining portion of that income attributable to state by formula that is based on relationship of state property, payroll, and sales to worldwide property, payroll, and sales. Polaroid Corp. v. Commissioner of Revenue (1984) 472 N.E.2d 259, 393 Mass. 490.

2. Filing consolidated return

Where a domestic corporation joined with four other Massachusetts corporations and two foreign corporations in filing a consolidated federal income tax return for the year 1955, the five domestic corporations were authorized by § 34 of this chapter (repealed; see, now § 32B of this chapter), to file a combined state return, and fact that domestic corporation had filed a separate

return did not constitute a binding election, and it was not precluded thereby from later filing a consolidated return and applying for an abatement. Felt Process Co. v. State Tax Commission (1959) 162 N.E.2d 76, 339 Mass. 651.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 27

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

---

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title IX. Taxation (Ch. 58-65c)
      Chapter 64H. Tax on Retail Sales of Certain Tangible Personal Property (Refs & Annos)

---

M.G.L.A. 64H § 1

§ 1. Definitions

Effective: October 1, 2019
Currentness

<[ Text of section applicable as provided by 2019, 41, Sec. 106.]>

As used in this chapter the following words shall have the following meanings:

"Business", any activity engaged in by any person or caused to be engaged in by a person with the object of gain, benefit or advantage, either direct or indirect.

"Commissioner", the commissioner of revenue.

"Engaged in business", commencing, conducting or continuing in business, as well as liquidating a business when the liquidator thereof holds itself out to the public as conducting such a business.

"Engaged in business in the commonwealth", (i) having a business location within the commonwealth; (ii) regularly or systematically soliciting orders for the sale of services to be performed within the commonwealth or for the sale of tangible personal property for delivery to destinations in the commonwealth; (iii) otherwise exploiting the retail sales market within the commonwealth through any means whatsoever, including, but not limited to, (a) salespeople, solicitors or representatives within the commonwealth, (b) catalogs or other solicitation materials sent through the mails or otherwise, (c) billboards, advertising or solicitations in newspapers, magazines, radio or television broadcasts, (d) computer networks or in any other communications medium, including through the means of an Internet website, software or cookies distributed or otherwise placed on customers' computers or other communications devices, or a downloaded application; (iv) regularly engaged in the delivery of property or the performance of services within the commonwealth; or (v) otherwise availing oneself of the substantial privilege of carrying on business within the commonwealth, including through virtual or economic contacts. A person shall be considered to have a business location within the commonwealth only if such person: (i) owns or leases real property within the commonwealth; (ii) has 1 or more employees located within the commonwealth; (iii) regularly maintains a stock of tangible personal property within the commonwealth for sale in the ordinary course of business; or (iv) regularly leases out tangible personal property for use within the commonwealth. For the purposes of this paragraph, property on consignment in the hands of a consignee and offered for sale by the consignee on the consignee's own account shall not be considered as stock maintained by the consignor; a person having a business location within the commonwealth solely by reason of regularly leasing out tangible personal property shall be considered to have a business location within the commonwealth only with respect to such leased property; and an employee shall be considered to be located within the commonwealth if: (a) the employee's service is performed entirely within the commonwealth, or (b) the employee's service is performed both within and without the commonwealth but in the performance of the employee's services the employee regularly commences the employee's activities at, and returns to, a place within the

---

ADD. 28

commonwealth. "Within the commonwealth" means within the exterior limits of the commonwealth of Massachusetts, and includes all territory within said limits owned by, or leased or ceded to, the United States of America. This provision shall be construed to the fullest extent of the U.S. Constitution unless otherwise limited by state law.

"Gross receipts", the total sales price received by a vendor as a consideration for retail sales.

"Home service provider", the facilities-based carrier or reseller with which the retail customer contracts for the provision of mobile telecommunications service.

"Marketplace", a physical or electronic forum, including a shop, a store, a booth, a television or radio broadcast, an Internet web site, a catalogue or a dedicated sales software application, where the tangible personal property or services of a marketplace seller is offered for sale, regardless of whether, in the case of tangible personal property, such property is physically located in the commonwealth.

"Marketplace facilitator", a person that contracts with 1 or more marketplace sellers to facilitate for a consideration, regardless of whether deducted as fees from the transaction, the sale of the seller's tangible personal property or services through a marketplace operated by the person, and engages: (a) directly or indirectly, through 1 or more related persons, in any of the following: (i) transmitting or otherwise communicating the offer or acceptance between the buyer and the seller; (ii) owning or operating the infrastructure, electronic or physical, or technology that brings buyers and sellers together; (iii) providing a virtual currency that buyers are allowed or required to use to purchase tangible personal property or services from the seller; or (iv) software development or research and development activities related to any of the activities described in subsection (b), if such activities are directly related to a physical or electronic marketplace operated by the person or a related person; and (b) in any of the following activities with respect to the seller's tangible personal property or services: (i) payment processing services; (ii) fulfillment or storage services; (iii) listing tangible personal property or services for sale; (iv) setting prices; (v) branding sales as those of the marketplace facilitator; (vi) order taking; (vii) advertising or promotion; or (viii) providing customer service or accepting or assisting with returns or exchanges; provided, however, that a marketplace facilitator may also be a marketplace seller; and provided further, that a marketplace facilitator shall not include a person who merely provides payment processing services. The commissioner may issue regulations or other guidance to further explain the definition of a marketplace facilitator, which guidance may in some circumstances limit the application of the term as it might otherwise apply.

"Marketplace seller", a person that makes retail sales through a marketplace operated by a marketplace facilitator; provided, however, that a marketplace seller may also be a marketplace facilitator.

"Mobile telecommunications service", commercial mobile radio service, as defined in section 20.3 of title 47 of the Code of Federal Regulations as in effect on June 1, 1999.

"Motion picture", a feature-length film, a video, a digital media project, a television series defined as a season not to exceed 27 episodes, or a commercial made in the commonwealth, in whole or in part, for theatrical or television viewing or as a television pilot. The term "motion picture" shall not include a production featuring news, current events, weather and financial market reports, talk show, game show, sporting events, awards show or other gala event, a production whose sole purpose is fundraising, a long-form production that primarily markets a product or service, or a production containing obscene material or performances.

"Motion picture production company", a company including any subsidiaries engaged in the business of producing motion pictures, videos, television series, or commercials intended for a theatrical release or for television viewing. The term "motion picture production company" shall not mean or include any company which is more than 25 per cent owned, affiliated, or controlled, by any company or person which is in default on a loan made by the commonwealth or a loan guaranteed by the commonwealth.

**ADD. 29**

"Person", an individual, partnership, trust or association, with or without transferable shares, joint-stock company, corporation, society, club, organization, institution, estate, receiver, trustee, assignee, or referee, and any other person acting in a fiduciary or representative capacity, whether appointed by a court or otherwise, and any combination of individuals acting as a unit.

"Place of primary use", the street address representative of where the customer's use of the mobile telecommunications service primarily occurs, which shall be the residential street address or the primary business address of the customer and which shall be within the licensed service area of the home service provider. The place shall be determined in accordance with 4 U.S.C. sections 121 and 122.

"Prepaid calling arrangement", the right to exclusively purchase telecommunications services, that shall be paid for in advance and enables the origination of the calls using an access number or authorization code, whether manually or electronically dialed.

"Purchaser", a person who purchases tangible personal property or services the receipts from the retail sale of which are taxable under this chapter and includes a buyer, vendee, lessee, licensee, or grantee.

"Remote marketplace facilitator", a marketplace facilitator that is engaged in business in the commonwealth only pursuant to: (i) subclause (b), (c) or (d) of clause (iii) of the first sentence of the definition of engaged in business in the commonwealth; or (ii) clause (v) of the first sentence of the definition of engaged in business in the commonwealth.

"Remote marketplace seller", a remote retailer that is a marketplace seller.

"Remote retailer", a retailer, including a marketplace seller or marketplace facilitator, that is engaged in business in the commonwealth only pursuant to: (i) subclauses (b), (c), or (d) of clause (iii) of the definition of engaged in business in the commonwealth; or (ii) clause (v) of the first sentence of the definition of engaged in business in the commonwealth.

"Retailer", includes (i) every person, including a marketplace seller, engaged in the business of making sales at retail; (ii) every person engaged in the making of retail sales at auction of tangible personal property whether owned by such person or others; (iii) every marketplace facilitator engaged in facilitating retail sales of tangible personal property or services, irrespective of whether such tangible personal property is owned by the facilitator or a marketplace seller and irrespective of whether such services are performed by the facilitator or a marketplace seller; (iv) every person, including a marketplace seller or marketplace facilitator, engaged in the business of making sales for storage, use or other consumption, or in the business of making sales at auction of tangible personal property whether owned by such person or others for storage, use or other consumption; (v) every salesperson, representative, peddler or canvasser who, in the opinion of the commissioner, it is necessary to regard for the efficient administration of this chapter as the agent of the dealer, distributor, supervisor or employer under whom the agent operates or from whom the agent obtains the tangible personal property sold by the agent, in which case the commissioner may treat and regard such agent as the retailer jointly responsible with the agent's principal, employer or supervisor for the collection and payment of the tax imposed by this chapter; and (vi) the commonwealth, or any political subdivision thereof, or their respective agencies when such entity is engaged in making sales at retail of a kind ordinarily made by private persons.

"Retail establishment", any premises in which the business of selling services or tangible personal property is conducted, or, in or from which any retail sales are made.

"Sale" and "selling", include (i) any transfer of title or possession, or both, exchange, barter, lease, rental, conditional or otherwise, of tangible personal property or the performance of services for a consideration, in any manner or by any means whatsoever; (ii) the producing, fabricating, processing, printing or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing or imprinting; (iii) the furnishing and distributing of tangible personal property or services for a consideration by social clubs and fraternal organizations to their members or others; (iv) a transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price; (v) a transfer for a consideration of the title or possession

of tangible personal property which has been produced, fabricated or printed to the special order of the customer, or of any publication; (vi) the furnishing of information by printed, mimeographed or multigraphed matter, or by duplicating written or printed matter in any other manner, including the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons, but excluding the furnishing of information, which is personal or individual in nature and which is not or may not be substantially incorporated in reports furnished to other persons, and excluding the services of advertising or other agents, or other persons acting in a representative capacity, and information services used by newspapers, radio broadcasters and television broadcasters in the collection and dissemination of news and excluding the furnishing of information by photocopy or other similar means by not for profit libraries which are recognized as exempt from taxation under section 501(C)(3) of the Federal Internal Revenue Code; (vii) the performance of services for a consideration, excluding (a) services performed by an employee for his employer whether compensated by salary, commission, or otherwise, (b) services performed by a general partner for his partnership and compensated by the receipt of distributive shares of income or loss from the partnership; and (c) the performance of services for which the provider is compensated by means of an honorarium, or fee paid to any person or entity registered under 15 U.S.C.A. § 80b-3 or 15 U.S.C.A. § 78q-1 for services the performance of which require such registration, for services related thereto or for trust, custody, and related cash management and securities services of a trust company as defined in chapter 172; and (viii) a sale within the meaning of subsections (i) to (vii) facilitated by a marketplace facilitator.

"Sale at retail" or "retail sale", a sale of services or tangible personal property or both for any purpose other than resale in the regular course of business. When tangible personal property is physically delivered by an owner, a former owner thereof, a factor, or an agent or representative of the owner, former owner or factor, to the ultimate purchaser residing in or doing business in the commonwealth, or to any person for redelivery to the purchaser, pursuant to a retail sale made by a vendor not engaged in business in the commonwealth, the person making or effectuating the delivery shall be considered the vendor of that property, the transaction shall be a retail sale in the commonwealth by the person and that person, if engaged in business in the commonwealth, shall include the retail selling price in its gross receipts, regardless of any contrary statutory or contractual terms concerning the passage of title or risk of loss which may be expressly or impliedly applicable to any contract or other agreement or arrangement for the sale, transportation, shipment or delivery of that property. That vendor shall include the retail selling price of the property in the vendor's gross receipts. The term "sale at retail" or "retail sale" shall not include: (a) sales of tickets for admissions to places of amusement and sports; (b) sales of transportation services; (c) professional, insurance, or personal service transactions which involve no sale or which involve sales as inconsequential elements for which no separate charges are made; or (d) any sale in which the only transaction in the commonwealth is the mere execution of the contract of sale and in which the tangible personal property sold is not in the commonwealth at the time of such execution; provided, however, that nothing contained in this definition shall be construed to be an exemption from the tax imposed under chapter 64*I*. In the case of interstate telecommunication services other than mobile telecommunications services, the sale of such services shall be deemed a sale within the commonwealth if the telecommunication is either originated or received at a location in the commonwealth and the services are either paid for in the commonwealth or charged to a service address located in the commonwealth. In the case of interstate and intrastate mobile telecommunications services, the sale of such services shall be deemed to be provided by the customer's home service provider and shall be considered a sale within the commonwealth if the customer's place of primary use is located in the commonwealth. To prevent actual multi-state taxation of any sale of interstate telecommunication service subject to taxation under this chapter, any taxpayer, upon proof that the taxpayer has paid a tax in another state on such sale, shall be allowed a credit against the tax imposed by this chapter to the extent of the amount of such tax properly due and paid in such other state. However, such credit shall not exceed the tax imposed by this chapter. In the case of the sale or recharge of prepaid calling arrangements, the sale or recharge of such arrangements shall be deemed to be within the commonwealth if the transfer for consideration physically takes place at a retail establishment in the commonwealth. In the absence of such physical transfer for consideration at a retail establishment, the sale or recharge shall be deemed a retail sale within the commonwealth if the customer's shipping address is in the commonwealth or, if there is no item shipped, if the customer's billing address or the location associated with the customer's mobile telephone number, as applicable, is in the commonwealth. For purposes of collection of the tax imposed by this chapter on such sales, such sale shall be deemed to occur on the date that the bill is first issued by the vendor in the regular course of its business; provided, however, in the case of prepaid calling arrangements, the sale shall be deemed to occur on the date of the transfer for consideration. For purposes of reporting the sale or recharge of

prepaid calling arrangements, the sale or recharge of the arrangements shall be considered a taxable sale of tangible personal property unless the vendor is otherwise required to report sales of telecommunications services.

"Sales price", the total amount paid by a purchaser to a vendor as consideration for a retail sale, valued in money or otherwise. In determining the sales price, the following shall apply: (a) no deduction shall be taken on account of (i) the cost of property sold; (ii) the cost of materials used, labor or service cost, interest charges, losses or other expenses; (iii) the cost of transportation of the property prior to its sale at retail; (b) there shall be included (i) any amount paid for any services that are a part of the sale; and (ii) any amount for which credit is given to the purchaser by the vendor; and (c) there shall be excluded (i) cash discounts allowed and taken on sales; (ii) the amount charged for property returned by purchasers to vendors upon rescission of contracts of sale when the entire amounts charged therefor, less the vendors' established handling fees, if any, for such return of property, are refunded either in cash or credit, and when the property is returned within 90 days from the date of sale, and the entire sales tax paid is returned to the purchaser; provided, however, that where a motor vehicle is returned pursuant to a rescission of contract such motor vehicle must be returned within 180 days of the date of sale; (iii) the amount charged for labor or services rendered in installing or applying the property sold; (iv) the amount of reimbursement of tax paid by the purchaser to the vendor under this chapter; (v) transportation charges separately stated, if the transportation occurs after the sale of the property is made; (vi) the amount of the manufacturers' excise tax levied upon motor vehicles under section 4061(a) of the Internal Revenue Code of 1954 of the United States, as amended [1] ; and (vii) a "service charge" or "tip" that is distributed by a vendor to service employees, wait staff employees or service bartenders as provided in section 152A of chapter 149.

"Services", a commodity consisting of activities engaged in by a person for another person for a consideration; provided, however, that the term "services" shall not include activities performed by a person who is not in a regular trade or business offering such person's services to the public, and shall not include services rendered to a member of an affiliated group, as defined by section 1504 of the Internal Revenue Code, [2] by another member of the same affiliated group that does not sell to the public the type of service provided to its affiliate; and provided further, that the term services shall be limited to telecommunications services; and provided further, that nothing herein shall exempt from tax sales of tangible personal property subject to tax under this chapter.

"Tangible personal property", personal property of any nature consisting of any produce, goods, wares, merchandise and commodities whatsoever, brought into, produced, manufactured or being within the commonwealth, but shall not include rights and credits, insurance policies, bills of exchange, stocks and bonds and similar evidences of indebtedness or ownership. For purposes of this chapter, "tangible personal property" shall include gas, electricity and steam. A transfer of standardized computer software, including but not limited to electronic, telephonic or similar transfer, shall also be considered a transfer of tangible personal property. The commissioner may, by regulation, provide rules for apportioning tax in those instances in which software is transferred for use in more than one state.

"Tax", the excise tax imposed by this chapter.

"Taxpayer", any person required to make returns or pay the tax imposed by this chapter.

"Telecommunications services", any transmission of messages or information by electronic or similar means, between or among points by wire, cable, fiberoptics, laser, microwave, radio, satellite or similar facilities but not including cable television. Telecommunications services shall be deemed to be services for purposes of this chapter and chapter 64*I*.

"Use of a service", enjoyment of the benefit of a service.

"Vendor", a retailer or other person selling tangible personal property or services of a kind the gross receipts from the retail sale of which are required to be included in the measure of the tax imposed by this chapter.

**Credits**

Added by St.1967, c. 757, § 1. Amended by St.1970, c. 563, § 1; St.1971, c. 555, §§ 40, 41; St.1976, c. 415, § 73; St.1978, c. 514, § 168; St.1986, c. 488, § 61; St.1988, c. 202, § 19; St.1990, c. 121, § 42; St.1990, c. 150, §§ 354 to 359; St.1991, c. 4, §§ 1 to 6; St.1992, c. 286, §§ 141, 142; St.1996, c. 450, § 118; St.1997, c. 88, § 23; St.1999, c. 127, § 91; St.2002, c. 186, §§ 24 to 27; St.2002, c. 469, §§ 1, 2; St.2003, c. 9, § 8, eff. April 1, 2003; St.2004, c. 262, § 48, eff. Aug. 9, 2004; St.2005, c. 158, § 3, eff. Feb. 21, 2006; St.2005, c. 163, §§ 31 to 34, eff. April 1, 2006; St.2007, c. 63, § 11, eff. July 20, 2007; St.2013, c. 46, §§ 48, 49, eff. July 31, 2013; St.2013, c. 95, §§ 1 to 3, eff. July 31, 2013; St.2019, c. 41, § 31, eff. Oct. 1, 2019.

Notes of Decisions (117)

## Footnotes

1        26 U.S.C.A. § 4061(a).

2        26 U.S.C.A. § 1504.

M.G.L.A. 64H § 1, MA ST 64H § 1
Current through Chapter 6 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.    ADD. 33

§ 148B. Persons performing service not authorized under this..., MA ST 149 § 148B

 KeyCite Red Flag - Severe Negative Treatment
Unconstitutional or PreemptedPreempted by Carey v. Gatehouse Media Massachusetts I, Inc., Mass.App.Ct., Feb. 27, 2018
 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XXI. Labor and Industries (Ch. 149-154)
      Chapter 149. Labor and Industries (Refs & Annos)

M.G.L.A. 149 § 148B

§ 148B. Persons performing service not authorized under this chapter deemed employees; exception

Effective: July 19, 2004

Currentness

(a) For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless:--

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

(b) The failure to withhold federal or state income taxes or to pay unemployment compensation contributions or workers compensation premiums with respect to an individual's wages shall not be considered in making a determination under this section.

(c) An individual's exercise of the option to secure workers' compensation insurance with a carrier as a sole proprietor or partnership pursuant to subsection (4) of section 1 of chapter 152 shall not be considered in making a determination under this section.

(d) Whoever fails to properly classify an individual as an employee according to this section and in so doing fails to comply,

ADD. 34

§ 148B. Persons performing service not authorized under this..., MA ST 149 § 148B

in any respect, with chapter 149, or section 1, 1A, 1B, 2B, 15 or 19 of chapter 151, or chapter 62B, shall be punished and shall be subject to all of the criminal and civil remedies, including debarment, as provided in section 27C of this chapter. Whoever fails to properly classify an individual as an employee according to this section and in so doing violates chapter 152 shall be punished as provided in section 14 of said chapter 152 and shall be subject to all of the civil remedies, including debarment, provided in section 27C of this chapter. Any entity and the president and treasurer of a corporation and any officer or agent having the management of the corporation or entity shall be liable for violations of this section.

(e) Nothing in this section shall limit the availability of other remedies at law or in equity.

**Credits**

Added by St.1990, c. 464. Amended by St.1992, c. 286, § 214; St.1993, c. 110, § 165; St.1998, c. 236, § 12; St.2004, c. 193, § 26, eff. July 19, 2004.

Notes of Decisions (207)

M.G.L.A. 149 § 148B, MA ST 149 § 148B
Current through Chapter 6 of the 2023 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 35

§ 436.1 Definitions., 16 C.F.R. § 436.1

---

Code of Federal Regulations

Title 16. Commercial Practices

Chapter I. Federal Trade Commission

Subchapter D. Trade Regulation Rules

Part 436. Disclosure Requirements and Prohibitions Concerning Franchising (Refs & Annos)

Subpart A. Definitions

16 C.F.R. § 436.1

§ 436.1 Definitions.

Effective: July 1, 2007

Currentness

Unless stated otherwise, the following definitions apply throughout part 436:

(a) Action includes complaints, cross claims, counterclaims, and third-party complaints in a judicial action or proceeding, and their equivalents in an administrative action or arbitration.

(b) Affiliate means an entity controlled by, controlling, or under common control with, another entity.

(c) Confidentiality clause means any contract, order, or settlement provision that directly or indirectly restricts a current or former franchisee from discussing his or her personal experience as a franchisee in the franchisor's system with any prospective franchisee. It does not include clauses that protect franchisor's trademarks or other proprietary information.

(d) Disclose, state, describe, and list each mean to present all material facts accurately, clearly, concisely, and legibly in plain English.

(e) Financial performance representation means any representation, including any oral, written, or visual representation, to a prospective franchisee, including a representation in the general media, that states, expressly or by implication, a specific level or range of actual or potential sales, income, gross profits, or net profits. The term includes a chart, table, or mathematical calculation that shows possible results based on a combination of variables.

(f) Fiscal year refers to the franchisor's fiscal year.

---

ADD. 36

(g) Fractional franchise means a franchise relationship that satisfies the following criteria when the relationship is created:

(1) The franchisee, any of the franchisee's current directors or officers, or any current directors or officers of a parent or affiliate, has more than two years of experience in the same type of business; and

(2) The parties have a reasonable basis to anticipate that the sales arising from the relationship will not exceed 20% of the franchisee's total dollar volume in sales during the first year of operation.

(h) Franchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

(i) Franchisee means any person who is granted a franchise.

(j) Franchise seller means a person that offers for sale, sells, or arranges for the sale of a franchise. It includes the franchisor and the franchisor's employees, representatives, agents, subfranchisors, and third-party brokers who are involved in franchise sales activities. It does not include existing franchisees who sell only their own outlet and who are otherwise not engaged in franchise sales on behalf of the franchisor.

(k) Franchisor means any person who grants a franchise and participates in the franchise relationship. Unless otherwise stated, it includes subfranchisors. For purposes of this definition, a "subfranchisor" means a person who functions as a franchisor by engaging in both pre-sale activities and post-sale performance.

(l) Leased department means an arrangement whereby a retailer licenses or otherwise permits a seller to conduct business from the retailer's location where the seller purchases no goods, services, or commodities directly or indirectly from the retailer, a person the retailer requires the seller to do business with, or a retailer-affiliate if the retailer advises the seller to do business with the affiliate.

ADD. 37

(m) Parent means an entity that controls another entity directly, or indirectly through one or more subsidiaries.

(n) Person means any individual, group, association, limited or general partnership, corporation, or any other entity.

(o) Plain English means the organization of information and language usage understandable by a person unfamiliar with the franchise business. It incorporates short sentences; definite, concrete, everyday language; active voice; and tabular presentation of information, where possible. It avoids legal jargon, highly technical business terms, and multiple negatives.

(p) Predecessor means a person from whom the franchisor acquired, directly or indirectly, the major portion of the franchisor's assets.

(q) Principal business address means the street address of a person's home office in the United States. A principal business address cannot be a post office box or private mail drop.

(r) Prospective franchisee means any person (including any agent, representative, or employee) who approaches or is approached by a franchise seller to discuss the possible establishment of a franchise relationship.

(s) Required payment means all consideration that the franchisee must pay to the franchisor or an affiliate, either by contract or by practical necessity, as a condition of obtaining or commencing operation of the franchise. A required payment does not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices for resale or lease.

(t) Sale of a franchise includes an agreement whereby a person obtains a franchise from a franchise seller for value by purchase, license, or otherwise. It does not include extending or renewing an existing franchise agreement where there has been no interruption in the franchisee's operation of the business, unless the new agreement contains terms and conditions that differ materially from the original agreement. It also does not include the transfer of a franchise by an existing franchisee where the franchisor has had no significant involvement with the prospective transferee. A franchisor's approval or disapproval of a transfer alone is not deemed to be significant involvement.

(u) Signature means a person's affirmative step to authenticate his or her identity. It includes a person's handwritten signature, as well as a person's use of security codes, passwords, electronic signatures, and similar devices to authenticate his or her identity.

(v) Trademark includes trademarks, service marks, names, logos, and other commercial symbols.

§ 436.1 Definitions., 16 C.F.R. § 436.1

(w) Written or in writing means any document or information in printed form or in any form capable of being preserved in tangible form and read. It includes: type-set, word processed, or handwritten document; information on computer disk or CD–ROM; information sent via email; or information posted on the Internet. It does not include mere oral statements.

SOURCE: 72 FR 15544, March 30, 2007, unless otherwise noted.

AUTHORITY: 15 U.S.C. 41–58.

Notes of Decisions (8)

Current through May 24, 2023, 88 FR 33551, with the exception of Title 15, which is current through May 19, 2023, 88 FR 32615. Some sections may be more current. See credits for details.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

| Massachusetts General Laws Annotated |
| Rules of the Supreme Judicial Court (Refs & Annos) |
| Chapter One. General Rules |

S.J.C. Rule 1:03

Rule 1:03. Uniform Certification of Questions of Law

Currentness

**Section 1. Authority to Answer Certain Questions of Law.** This court may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or of the District of Columbia, or a United States District Court, or the highest appellate court of any other state when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court.

**Section 2. Method of Invoking.** This rule may be invoked by an order of any of the courts referred to in Section 1 upon that court's own motion or upon the motion of any party to the cause.

**Section 3. Contents of Certification Order.** A certification order shall set forth

(1) the question of law to be answered; and

(2) a statement of all facts relevant to the questions certified and showing fully the nature of the controversy in which the questions arose.

**Section 4. Preparation of Certification Order.** The certification order shall be prepared by the certifying court, signed by the judge presiding at the hearing, and forwarded to this court by the clerk of the certifying court under its official seal. This court may require the original or copies of all or of any portion of the record before the certifying court to be filed with the certification order, if, in the opinion of this court, the record or portion thereof may be necessary in answering the questions.

**Section 5. Costs of Certification.** Fees and costs shall be the same as in civil appeals docketed before this court and shall be equally divided between the parties unless otherwise ordered by the certifying court in its order of certification.

**Section 6. Briefs and Arguments.** Proceedings in this court shall be those provided in these rules, the Massachusetts Rules

of Appellate Procedure or statutes governing briefs and arguments, so far as reasonably applicable.

**Section 7. Opinion.** The written opinion of this court stating the law governing the questions certified shall be sent by the clerk under the seal of this court to the certifying court and to the parties.

**Section 8. Power to Certify.** This court on its own motion or the motion of any party may order certification of questions of law to the highest court of any state when it appears to the certifying court that there are involved in any proceeding before the court questions of law of the receiving state which may be determinative of the cause then pending in the certifying court and it appears to the certifying court that there are no controlling precedents in the decisions of the highest court or intermediate appellate courts of the receiving state.

**Section 9. Procedure on Certifying.** The procedures for certification from this state to the receiving state shall be those provided in the laws of the receiving state.

**Section 10. Uniformity of Interpretation.** This rule shall be so construed as to effectuate its general purpose to make uniform the law of those states which adopt it; or enact a uniform certification statute.

**Section 11. Short Title.** This rule may be cited as the Uniform Certification of Questions of Law Rule.

**Editors' Notes**

**TABLE OF JURISDICTIONS WHEREIN ACT HAS BEEN ADOPTED**

| Jurisdiction | Laws | Effective Date | Statutory Citation |
|---|---|---|---|
| Alabama ......................................... | | | Ala.Rules of App.Proc., Rule 18. |
| Alaska ......................................... | | | Alaska Rules of Appellate Procedure, Rule 407. |
| Arizona ......................................... | 1984, c. 111 | 8-3-1984 | A.R.S. §§ 12-1861 to 12-1867. |
| Colorado......................................... | | 4-1-1970 | Colo.App.Rules, Rule 21.1. |
| District of Columbia ............... | P.L. 99-573 | 10-28-19 86 | D.C. Official Code, 2001 Ed. § 11-723. |

Rule 1:03. Uniform Certification of Questions of Law, MA R S CT Rule 1:03

| | | | |
|---|---|---|---|
| Florida............................................ | | 3-1-1961 | Rules of App.Proc., Rule 9.150. |
| Georgia .......................................... | | | Ga. Code Ann. § 15-2-9. |
| Iowa .............................................. | 1979, S.F. 294 | 1-1-1980 | I.C.A. §§ 684A.1 to 684A.11. |
| Kansas........................................... | 1979, c. 181 | 7-1-1979 | K.S.A. §§ 60-3201 to 60-3212. |
| Kentucky ....................................... | | 9-1-1978 | Rules of Civil Procedure, Rule 76.37. |
| Louisiana...................................... | 1972, No. 84 | | LSA-R.S. 13:72.1; Sup.Ct.Rule 12. |
| Maine............................................. | | 1-1-2001 | Rules of Appellate Proc., Rule 25. |
| Massachusetts........................... | | 11-1-1971 | Rules of Supreme Judicial Court, General Rule 1:03. |
| Mississippi................................ | | 8-1-1980 | Rules of Appellate Procedure, Rule 20. |
| New Hampshire ......................... | | 4-2-1968 | RSA 490: Supreme Ct.Rules, Rule 34. |
| New Mexico............................... | Sup.Ct. Order 9-16-1986 | | NMRA, Rules of Appellate Procedure, Rule 12-607. |
| North Dakota ............................ | | 2-15-1977 | Rules of App.Proc., Rule 47. |
| Ohio ............................................. | | 7-15-1988 | Supreme Court Rules of Practice, Rule XVIII. |
| Oregon ......................................... | 1983, c. 103 | | ORS 28.200 to 28.255. |

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 42

**Rule 1:03. Uniform Certification of Questions of Law, MA R S CT Rule 1:03**

| | | | |
|---|---|---|---|
| Rhode Island .............................. | | | Supreme Court Rules, Article I, Rule 6. |
| South Dakota ............................ | 1984, c. 154 | | SDCL 15-24A-1 to 15-24A-11. |
| Washington ................................ | | 4-24-1974 | West's RCWA 2.60.010 to 2.60.900. |
| Wisconsin ................................... | Sup. Ct. Order 6-16-1982 | 1-1-1983 | W.S.A. 821.01 to 821.12. |
| Wyoming .................................... | 1976, c. 36 | | Rules of Appellate Procedure, Rules 11.01 to 11.07. |

Notes of Decisions (23)

S.J.C. Rule 1:03, MA R S CT Rule 1:03
Current with amendments received through May 1, 2023. Some rules may be more current; see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

ADD. 43